Argued and submitted July 13, 1984, affirmed December 4, 1985, reconsideration denied January 17, petition for review denied February 19, 1986 (300 Or 546)

## QUINN,
*Respondent,*

*v.*

## SOUTHERN PACIFIC TRANSPORTATION COMPANY,
*Appellant.*

## (16-80-10533; CA A28468)

711 P2d 139

Jeffrey M. Batchelor, Portland, argued the cause for appellant. With him on the briefs was Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland.

Paul B. Gamson, Portland, argued the cause for

respondent. With him on the brief were Liana Colombo and Kulongoski, Durham, Drummonds & Colombo, Portland.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

WARDEN, J.

## WARDEN, J.

In this unlawful employment practice case, Southern Pacific Transportation Company appeals from a judgment awarding plaintiff a money judgment for back pay and requiring it to enroll plaintiff in the next training class for locomotive firemen. We review *de novo, Wincer v. Ind. Paper Stock Co.,* 48 Or App 859, 618 P2d 15 (1980), and affirm.

The background facts are largely undisputed. Plaintiff applied for a position with Southern Pacific as a railroad hostler in October, 1977. Southern Pacific sent him to Dr. Redfield for a pre-employment physical examination. As a part of that examination, plaintiff was given the Ishihara color vision test, which is designed to identify persons with red-green color deficiency. The test requires the examinee to view a number of colored plates, each of which is a configuration of colored dots on a background of other colors. A person with normal red-green vision can discern the image of a number on each of the plates, but a person with a red-green color deficiency cannot. Plaintiff was unable to identify correctly the Ishihara plates, but was able to identify colors on a bright color chart. In his report to Southern Pacific, Redfield remarked that plaintiff was "Ishihara—Color Blind" but indicated that he could see red, green and amber and that the deficiency was not disqualifying. Plaintiff began working as a hostler in November, 1977.

In November, 1978, plaintiff applied for a training class for fireman to become qualified for engine service, a craft that includes firemen and engineers. Employment as a fireman is a prerequisite to employment as an engineer, and transfer to engine service constitutes a change of craft from hostler. Plaintiff was accepted, subject to passing a physical examination. He was re-examined by Redfield in December. Plaintiff again failed the Ishihara test but passed the color chart test. Redfield noted the deficiency, but nonetheless recommended that plaintiff be accepted into the class. However, Dr. Meyers, Southern Pacific's chief medical officer, disqualified plaintiff from engine service. Bonacina, a train master and road foreman of engines, testified that he advised plaintiff of the disqualification. At Bonacina's suggestion, plaintiff then consulted Dr. Cox, an opthamologist. Plaintiff

again failed the Ishihara test, although he successfully completed two other color vision tests.

Southern Pacific cancelled the January, 1979, training class and rescheduled it for January, 1980. In October, 1979, plaintiff reapplied for a transfer to engine service and enrollment in the scheduled class. On November 21, 1979, Bonacina contacted plaintiff to advise him that he had arranged the necessary physical examination; later that same day, Bonacina told plaintiff that there had been a mix-up and that plaintiff was not being considered for the class because of his color vision deficiency.

Plaintiff continued working as a hostler, and in November, 1980, he commenced this action under ORS 659.121,[1] alleging that Southern Pacific's refusal to accept him for firemen's training because of his visual deficiency constituted an unlawful employment practice prohibited by Oregon's Handicapped Persons' Civil Rights Act. ORS 659.400 *et seq.* The court entered, *inter alia,* the following findings of fact and conclusions of law:

"10. Defendant requires a color vision test of all applicants for the fireman position. Some applicants are given a wool skein test and some are given the Ishihara test. Not all physicians used by Southern Pacific to conduct medical examinations use the Ishihara test.

"11. Some individuals, including Robert Park and James Page, who have similar color vision to Mr. Quinn, are employed as firemen and engineers for defendant in the Oregon Division.

"12. Defendant's Chief Medical Officer, Dr. John

---

[1] ORS 659.121 provides, in relevant part:

"(1) Any person claiming to be aggrieved by an unlawful employment practice prohibited by ORS 659.030, 659.035, 659.227, 629.270, 659.295, 659.330, 659.340, 659.410, 659.415, 659.420 or 659.425 may file a civil suit in circuit court for injunctive relief and the court may order such other equitable relief as may be appropriate, including but not limited to reinstatement or the hiring of employes with or without back pay. Back pay liability shall not accrue from a date more than two years prior to the filing of a complaint with the Commissioner of the Bureau of Labor and Industries, pursuant to ORS 659.040, or if no such complaint has first been filed, then, more than two years prior to the filing of the civil suit provided for in ORS 659.040, 659.045, 659.095 and this section. In any suit brought under this subsection, the court may allow the prevailing party costs and reasonable attorney fees at trial and on appeal."

Meyers, disqualified plaintiff for firemen training on December 18, 1979, because of Mr. Quinn's color perception.

"13. In December, 1979, defendant's General Solicitor Oglesby H. Young stated that Mr. Quinn was not accepted for engine service because of his color vision.

"14. Defendant did not enroll plaintiff in the firemen's class because of his vision deficiency.

"15. The job of fireman requires the ability to distinguish red, green, amber, blue and white traffic signals. That plaintiff is able to distinguish between red, green, amber, blue and white. Mr. Quinn's color vision is not perfect. His color vision may not prevent the performance of the work involved.

"16. That the use of an Ishihara test for color vision or any other test was in a state of transition from the period when Mr. Quinn was considering moving from hostler to fireman. That the company was attempting to find some uniformity in its testing for color vision, but had not achieved uniformity. That there was a lack of uniformity in the testing for color vision.

"17. That the use of the Ishihara color vision test to bar Mr. Quinn from his employment would be arbitrary and would show a discriminatory intent on the part of the defendant.

"18. That there is no rational relationship between the safety performance of employees and the results of the Ishihara test.

"19. Defendant did not present any evidence, medical or historical or clinical that the Ishihara test is a good determiner of the performance of a person in the operation of engines on the railroad, either as a fireman or as an engineer. That Dr. Meyers has an extreme bias in favor of defendant.

"CONCLUSIONS OF LAW

"* * * * *

"2. That plaintiff is physically impaired within the meaning of ORS 659.400-659.425. That plaintiff's color vision is a physical impairment which, with reasonable accommodation by the employer, does not prevent the performance of the work involved.

"* * * * *

"7. That defendant committed an unlawful employment practice by refusing to employ Mr. Quinn as fireman because of color vision in violation of ORS 659.425(1).

"\* \* \* \* \*

"10. That under the circumstances that the color vision test is unproven and mindful of the concern for the safety of the passengers and the persons that might be involved with the transportation of cargo on the railroad, Mr. Quinn should be subjected to the further requirement of a practical test for a period of one year."

The trial court entered judgment for $60,333.09, plus interest, as back pay and also ordered Southen Pacific to enroll plaintiff in the next firemen's class to be conducted.

Southern Pacific's first challenge on appeal is to the subject matter jurisdiction of the trial court. It contends that the trial court lacked jurisdiction, because the Railway Labor Act, 45 USC § 151 *et seq*, vests primary and exclusive jurisdiction over labor-related disputes between the railroads and their employes in the National Railroad Adjustment Board (NRAB). Southern Pacific relies on 45 USC §§ 152 and 153, which respectively provide, in part:

"It shall be the duty of all carriers, their officers, agents and employes to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employers thereof." 45 USC § 152.

"(i) The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." 45 USC § 153(i).

The foundation of Southern Pacific's argument is that plaintiff's complaint is fairly characterized as one "concerning rates of pay, rules or working conditions" and is, therefore, within the exclusive jurisdiction of the NRAB.

■     We reach a contrary conclusion. As expressed by the United States Supreme Court, the purpose of the Railway Labor Act is "to promote stability in labor management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employe disputes *arising out of the interpretation of collective bargaining agreements." Union Pacific R. Co. v. Sheehan,* 439 US 89, 94, 99 S Ct 399, 58 L Ed 2d 354 (1978). (Emphasis supplied.) The exclusive jurisdiction of NRAB, therefore, extends to any claim which depends on an interpretation of the collective bargaining agreement; it is the essential nature of the claim that controls, not the characterization. *Andrews v. Louisville & Nashville R. Co.,* 406 US 320, 322-24, 92 S Ct 1562, 32 L Ed 2d 95 (1972); *see also Gray v. Chessie System,* 588 F Supp 1334 (D Md 1984). In *Andrews,* for example, the Supreme Court considered a claim of "wrongful discharge" that was based on the employer's failure to allow him to return to work after an automobile accident. The court reasoned that the only source of the plaintiff's right not to be discharged, and therefore to treat the discharge as a "wrongful" one, was the collective bargaining agreement between the employer and the union. The disagreement turned on the extent of the employer's obligation to restore the plaintiff to his former position, and a determination of that obligation was dependent on the interpretation to be given the collective bargaining agreement. The claim, therefore, was subject to the Railway Labor Act's requirement that it be submitted to NRAB for adjustment. 406 US at 323-24.

■     In this case, neither plaintiff nor Southern Pacific suggests that plaintiff's claim implicates any provision of a collective bargaining agreement. Conversely, it is acknowledged by all that the sole source of plaintiff's alleged right to attend the firemen's class is an express statutory provision designed to prevent discrimination against mentally or physically impaired persons. ORS 659.425. Although our research has disclosed no United States Supreme Court cases concerning handicap discrimination in the context of the Railway Labor Act, the Court specifically has held that the act does not bar states from enacting legislation to protect employes against racial discrimination in hiring and has noted that it does not even mention discrimination in hiring. *Colorado Comm'n v. Continental,* 372 US 714, 724, 83 S Ct 1022, 10 L Ed

2d 84 (1963). By analogy, a state is not preempted from legislatively extending protection in the field of discrimination in employment of handicapped workers to include railroad employes. *Accord, Chicago & N.W.R.R. v. Labor & Ind. Rev. Comm.,* 91 Wis 2d 462, 283 NW2d 603 (1979), *aff'd on other grounds,* 98 Wis 2d 592, 297 NW2d 819 (1980). It follows that, where a personal judicial remedy created by valid state legislation exists, a claim of right derived from that legislation is within the jurisdiction of the appropriate state court. *See Vaughn v. Pacific Northwest Bell Telephone,* 289 Or 73, 611 P2d 281 (1980). We conclude that the exclusive jurisdiction of NRAB over collective bargaining agreements does not preclude state court jurisdiction in this case, which is based on an independent statutory right, not on resolution of a contract dispute. The trial court properly exercised jurisdiction over plaintiff's claim.

Southern Pacific's four additional assignments of error address specific findings and conclusions of the trial court. Essentially, however, two issues are presented: (1) whether plaintiff's visual anomaly entitles him to the protection of ORS 659.425; and (2) whether, taking into account the job requirements and safety considerations, Southern Pacific's disqualification of plaintiff from engine service based on his performance on the Ishihara test could be found to constitute a violation of that statute, *i.e.,* whether passing of the test is a "bona fide occupational requirement" (BFOR) under ORS 659.030(1). *See Civil Serv. Bd. of Portland v. Bureau of Labor,* 298 Or 307, 692 P2d 569 (1984).

The first issue requires interpretation of portions of ORS 659.400 and ORS 659.425. ORS 659.400 is a definitional section, and in relevant part provides:

"As used in ORS 659.400 to 659.435, unless the context requires otherwise:

"* * * * *

"(2) 'Handicapped person' means a person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment or is regarded as having such an impairment.

"(3) As used in subsection (2) of this section:

"(a) 'Major life activity' includes, but is not limited to

self-care, ambulation, communication, transportation, education, socialization, employment and ability to acquire, rent or maintain property.

"(b)  'Has a record of such an impairment' means has a history of, or has been misclassified as having such an impairment.

"(c)  'Is regarded as having an impairment' means that the individual:

"(A)  Has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer or supervisor as having such a limitation;

"(B)  Has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of others toward such impairment; or

"(C)  Has no physical or mental impairment but is treated by an employer or supervisor as having an impairment."

The relevant proscriptive provisions are set forth in ORS 659.425(1):

"For the purpose of ORS 659.400 to 659.435, it is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges or employment because:

"(a)  An individual has a physical or mental impairment which, with reasonable accommodation by the employer, does not prevent the performance of the work involved;

"(b)  An individual has a record of a physical or mental impairment; or

"(c)  An individual is regarded as having a physical or mental impairment."

The term "handicapped person" defined in ORS 659.400(2) does not appear in ORS 659.425(1), and the term "physical or mental impairment" as it appears in the operative language of ORS 659.425(1) is not statutorily defined. As the first prong of a two-prong argument, Southern Pacific argues that the term "physical or mental impairment" in ORS 659.425(1) nonetheless logically must be read in conjunction with the definitional section and, therefore, must be construed to mean a "physical or mental impairment *which substantially limits one or more major life activities * * *.*" ORS 659.400(2).

(Emphasis supplied). As the second prong of its argument, Southern Pacific contends that, so defined, "physical impairment" simply does not include plaintiff's color vision so as to bring him within the scope of the statute. Plaintiff argues that ORS 659.425(1) does not require an impairment that substantially limits a major life activity but that the statute broadly extends protection where any impairment is involved. Alternatively, plaintiff argues that, if the statute covers only those who are substantially limited in a life activity, he is protected because his color vision deficiency substantially limits him in the "life activity" of employment.

It is immaterial whether plaintiff's vision deficiency interferes with a major life activity, because on this record it is not established that plaintiff has a handicap that would prevent him from performing the duties of an engineer. The trial court specifically found that "[h]is color vision may not prevent the performance of the work involved."

■ ORS 659.425(1), however, extends protection, not only to persons who have physical or mental impairments that substantially limit major life activities, but also to persons having physical or mental impairments that do not substantially limit major life activities but who are treated by employers as having such limitations. ORS 659.400(3)(c)(A). The question then becomes whether plaintiff's color vision deficiency has been treated by defendant, his employer, as being an impairment which substantially limits a major life activity. Under ORS 659.400(3)(a), employment is a major life activity, and it is clear that, because of his color vision, plaintiff's employment opportunity in engine service with Southern Pacific has been limited. Southern Pacific has treated plaintiff's impairment as limiting a major life activity.

We turn next to the question of whether Southern Pacific's refusal to permit plaintiff to participate in the firemen's class because of his visual impairment constituted a violation of ORS 659.425. Southern Pacific addresses specific challenges to the trial court's findings that there is no rational relationship between performance on the Ishihara test and performance in engine service and that precluding plaintiff from engine service on the basis of his performance on that test is arbitrary and discriminatory. The foundation of its argument is that, assuming that plaintiff's color vision brings

him within the scope of the statute, its disqualification of him was not unlawful, because public safety is an essential part of its business, and it had a reasonable basis for believing that plaintiff could not safely perform the job duties. We take this to be an assertion of a BFOR defense under ORS 659.030(1)(a).[2]

Under ORS 659.425(1)(a), the right to employment without discrimination because of handicap exists when the impairment, "with reasonable accommodation, does not prevent the performance of the work involved." The standard to be applied in determining when an impairment does prevent work performance so as to justify a refusal to employ is not legislatively expressed. We are guided, however, by the Supreme Court's interpretation in *Montgomery Ward v. Bureau of Labor,* 280 Or 163, 570 P2d 76 (1977), of the former version of ORS 659.425(1), which similarly precluded discrimination "unless it can be shown that the particular handicap prevents the performance of the work involved."

In *Montgomery Ward,* a man who had had a heart attack and who had continuing angina was refused employment as a heavy appliance salesman because of his heart condition. A proceeding was commenced before the Commissioner of Labor; the issue was how to take into account the factor of potential injury to the applicant in determining whether the applicant's impairment "prevents the performance of the work." The Commissioner had found that, to justify a refusal to employ, a disability must present a "high probability" of incapacitation of the applicant while performing the job duties. 280 Or at 165. On appeal, this court had disagreed, identifying the appropriate standard to be "a reasonable medical possibility" that the applicant might be

---

[2] ORS 659.030(1)(a) provides that it is an unlawful employment practice:

"For an employer, because of an individual's race, religion, color, sex, national origin, marital status or age if the individual is 18 years of age or older and under 70 years of age, or because of the race, religion, color, sex, national origin, marital status or age of any other person with whom the individual associates, or because of a juvenile record, that has been expunged pursuant to ORS 419.800 to 419.839, of any individual, to refuse to hire or employ or to bar or discharge from employment such individual. However, discrimination is not an unlawful employment practice if such discrimination results from a bona fide occupational requirement reasonably necessary to the normal operation of the employer's business."

unable to perform the work or could experience injury as a result of attempting to perform it. 280 Or at 168. The Supreme Court rejected both views, finding that the underlying policy considerations of the act[3] were best served by an intermediate standard:

> "[W]e think that the Commissioner raises the standard beyond the policy of the statute when he requires a 'high' probability of incapacitation, while the mere 'reasonable possibility' expressed by the Court of Appeals lowers it too far.
>
> "It is our conclusion that the legislature intended by the statutory language to impose upon an employer the obligation not to reject a prospective employee because of a physical or mental handicap unless there is, because of the defect, a *probability either that the employee cannot do the job in a satisfactory manner or that he can do so only at the risk of incapacitating himself.* The 'fullest possible participation in the * * * economic life of the state' and the 'reasonable demands of the position' would seem to require no less a standard." 280 Or at 168. (Emphasis supplied.)

The *Montgomery Ward* court also rejected our analysis that, because the employer relied in good faith on its physician's reasonable opinion that the applicant's condition was not compatible with the projected employment, the employer as a matter of law was not guilty of discrimination. Conversely, the court concluded that good faith and reasonableness of the employer's action were relevant only to the issue of sanctions:

> "The question whether the employer acted in good faith or

---

[3] The legislative policy considerations were expressed in ORS 659.405 (*amended by* 1979 Or Laws ch 640, § 2):

"(1) It is declared to be the public policy of Oregon to guarantee physically and mentally handicapped persons the fullest possible participation in the social and economic life of the state, to engage in remunerative employment, to use and enjoy places of public accommodation, resort or amusement, and to secure housing accommodations of their choice, without discrimination.

"(2) The right to otherwise lawful employment without discrimination because of physical or mental handicap where the reasonable demands of the position do not require such a distinction, and the right to use and enjoy places of public accommodation, resort or amusement, and to purchase or rental of property without discrimination because of physical or mental handicap, are hereby recognized and declared to be the rights of all the people of this state. It is hereby declared to be the policy of the State of Oregon to protect these rights and ORS 659.400 to 659.435 shall be construed to effectuate such policy."

The 1979 amendments made no substantive change in ORS 659.405.

on reasonable grounds goes to the propriety of a sanction, but it does not control the employee's employment rights under the statute. * * * As we read the Act, there is nothing therein to indicate that it was the intention of the legislature to exclude from the purview of the Act employers who acted in good faith and upon reasonable appearances. The emphasis is entirely upon whether the applicant is capable of fulfilling the job requirements. Language such as, 'unrelated to a person's ability to perform,' 'prevents the performance,' 'reasonable demands of the position,' and 'fullest possible participation in the * * * economic life of the state,' obviously does not speak of reasonable appearances to the employer or of the employer's good faith in failing to employ the applicant. The expert testimony on both sides is unanimous that the employer's action was reasonable under the circumstances known to it, and this testimony is relevant to whether sanctions and damages may be levied against the employer." 280 Or at 169.

Southern Pacific emphasizes, however, that *Montgomery Ward* concerned only the standard to be applied in assessing the potential of incapacitation of the applicant himself and did not implicate the safety of others. It correctly observes that Oregon appellate courts have not decided the extent to which the safety of others may affect the *Montgomery Ward* standard. *See Pac. Motor Trucking Co. v. Bur. of Labor,* 64 Or App 361, 367, n 7, 668 P2d 446, *rev den* 295 Or 773 (1983). It argues that because, as a common carrier, it owes an extraordinarily high degree of care in its operation and because safety is an essential part of its business, application of the *Montgomery Ward* "probability" test would be inappropriate. It suggests that a test more applicable to employment practices involving public safety would be that enunciated in *Usery v. Tamiami Trail Tours, Inc.,* 531 F2d 224 (5th Cir 1976).

At issue in *Tamiami* was the corporation's 40-year age limitation for hiring intercity bus drivers. The action was brought under the federal Age Discrimination in Employment Act, 29 USC § 621 *et seq,* which prohibits discrimination based on age, except "where age is a *bona fide* occupational qualification reasonably necessary to the normal operation of the particular business." 29 USC § 623(f)(1). The *Tamiami* court interpreted and applied two earlier tests from *Diaz v. Pan Am. World Airways, Inc.,* 442 F2d 385 (5th Cir), *cert den* 404 US

950 (1971), and *Weeks v. Southern Bell Telephone & Telegraph Company,* 408 F2d 228 (5th Cir 1969), both gender discrimination cases. It noted that *Diaz* mandates that the job qualifications invoked to justify the discrimination must be *reasonably necessary* to the essence of the involved business, *e.g.,* the safe transportation of bus passengers, and under that test

> "[t]he greater the safety factor, measured by the likelihood of harm and the probable severity of that harm in case of an accident, the more stringent may be the job qualifications designed to insure safe driving." 531 F2d at 236.

If the employer's job qualifications pass muster under *Diaz,* the two-prong BFOQ (the federal version of BFOR) test of *Weeks* is applied

> "whether [the employer] had reasonable cause, that is, a factual basis, for believing that all or substantially all persons over 40 would be unable to perform safely and efficiently the duties of the job involved, or whether it is impossible or impractical to deal with persons over 40 on an individualized basis." 531 F2d at 236.

Using that criterion, the *Tamiami* court upheld the lower court's decision that age was a *bona fide* occupational qualification reasonably necessary to the bus company's safe operation. The court concluded:

> "This interpretation of *Weeks-Diaz* clarifies the significance of safety to passengers and members of the public. We emphasize safety in busing just as we would in a variety of other industrial areas where safety to fellow employees is of such humane importance that the employer must be afforded substantial discretion in selecting specific standards which, if they err at all, should err on the side of preservation of life and limb. The employer must of course show a reasonable basis for its assessment of risk of injury/death. But it cannot be expected to establish this to a certainty, for certainty would require running the risk until a tragic accident would prove that the judgment was sound. Priceless as is a single life in our concept of the value of human life and our undoubted unwillingness ever to approve a practice which might kill one but not, say, twenty, we think the safety factor should be evaluated in terms of the possibility or likelihood of injury/ death." 531 F2d at 238.

Southern Pacific urges us to adopt the *Tamiami* standard as the one against which its employment practices

should be measured in this case, *i.e.,* the standard for a BFOR. It posits that, under that standard, it did not violate ORS 659.425, because the safety concerns involved in operating a train on the main line entitled it to impose the Ishihara test as an employment qualification, it had reasonable cause based on medical evidence to believe that substantially all who cannot identify the numbers on the Ishihara test cannot safely operate a train on the main line and there was no method to deal individually with each color deficient candidate for loco-motive fireman.

██ ██     Although we recognize that safety necessarily is a paramount concern of a common carrier, we decline to adopt the *Tamiami* standard for application to handicap discrimina-tion cases because of its potential for blanket disqualification of a class of persons with a given handicap.[4] If the Handi-capped Persons' Civil Rights Act is to have any substance, the emphasis must remain on whether the individual applicant is capable of fulfilling the job requirements. *See Montgomery Ward v. Bureau of Labor, supra,* 280 Or at 169. Adherence to that principle is necessary to prevent the kind of invidious discrimination based on unfounded stereotyping that the Act is designed to prevent. It is clear that, whether an applicant's own personal safety or that of others is in question, the Act requires an individual assessment of the safety risk.

██     Applying that principle to this case, we conclude that the "probability" standard enunciated in *Montgomery Ward* adequately protects common carrier employers from excess personal injury liability, and also protects the public and handicapped individuals from harm. We do not understand that test to be whether it is more probable than not that a person's impairment would create a hazard to himself or others, but whether, under all the circumstances, there is a

---

[4] In *Civil Service Bd. of Portland v. Bureau of Labor,* 61 Or App 70, 655 P2d 1080 (1982), this court interpreted the *Tamiami* test as allowing an employer to prove a BFOQ defense when there is a substantial safety interest involved by showing a reasonable basis for its assessment that the possibility or likelihood of injury or death would increase if it eliminated its maximum hiring age and concluded that the Commissioner had failed to apply that test properly. On review, the Supreme Court reversed, stating that the proper inquiry under the limited scope of review was not whether the Commissioner erroneously interpreted federal law, but whether the Commissioner's interpretation of the statute was permissible. *Civil Serv. Bd. of Portland v. Bureau of Labor,* 298 Or 307, 315-16, 692 P2d 569 (1984). That case, therefore, is inapposite.

*reasonable probability* that the applicant's condition renders him unable to perform the job duties in a manner which will not endanger himself or others. Inherent in that analysis is a consideration of the likelihood and probable severity of harm in the event of an accident; the more hazardous the job, the more stringent employment qualifications may be.

Our final inquiry, then, is whether Southern Pacific has demonstrated a factual basis for believing, to a reasonable probability, that plaintiff, because of his color vision, could *not safely perform the job of fireman.* As we noted above, the trial court found that plaintiff's vision deficiency may not prevent his performance of the work of a fireman. Because firemen are selected and trained with the expectation that they will become engineers, we look at the job demands of engineers. An engineer may be required to operate a train unassisted by a fireman. A train may be operated at speeds up to 70 miles per hour, and a locomotive pulling an average of 70 cars requires a stopping distance of one-third to three-fourths of a mile. Engineers are required to recognize quickly and respond to color signals of red, green, amber, blue and white.

It is not disputed that color vision is important to the job of either a fireman or an engineer. Evidence given by three physicians, Redfield, Cox and Meyers, however, is conflicting as to the extent that plaintiff's color vision deficiency affects his ability to operate a train. Redfield, who periodically conducted pre-employment or promotional examinations for Southern Pacific and who initially examined plaintiff, testified that Southern Pacific did not instruct him regarding the color vision test to be administered to applicants. However, because he customarily uses the Ishihara test, he routinely administers it to all applicants for Southern Pacific employment. If an applicant cannot discern the Ishihara plates, he uses a "bright color" chart of his own design; he considered plaintiff qualified, because he could readily distinguish red, green and amber on that test. He expressed the opinion that the Ishihara is not a good indicator of who is qualified to drive a train but, because it is designed to discover very subtle red-green *color vision deficiencies, it is useful* as a screening device. He testified that he did not believe rain or fog conditions would prevent plaintiff from accurately identifying color signals.

Cox testified that he supervised the administration to plaintiff of three separate color vision test—the Ishihara, the Farnsworth and the Duochrome tests.[5] He stated that, although plaintiff could not identify the Ishihara plates, the results of the other two tests were normal. He concluded that plaintiff had a "mild to moderate" red-green color deficiency and that plaintiff is not color blind but "merely has limited ability to distinguish between shades of red and shades of green" and that plaintiff "is easily able to distinguish between red and green." He testified that he had inadequate knowledge of the duties of a fireman or engineer to offer an opinion as to whether plaintiff's color vision precluded him from working in those positions.

In contrast, the testimony of Meyers, Southern Pacific's chief medical officer, is unequivocal that the Ishihara is the most effective test for qualifying applicants for engine service. He expressed the opinion that a person who missed more than two plates in the Ishihara eight-plate series would present a safety hazard if employed as an engineer and testified that he had disqualified plaintiff from engine service on the basis of his performance on the Ishihara. He indicated that he has attempted since 1974 to standardize the Ishihara as the color vision test to be used by examining physicians for Southern Pacific and that he orally advised various physicians of that requirement in 1974, but that, as of 1979, the Ishihara test was not uniformly given. He also testified that color deficient individuals require significantly greater illumination to perceive color accurately and that in his opinion adverse weather conditions could cause difficulty in differentiating color.

Southern Pacific also called Bonacina, its Eugene area train master and foreman of engines. He testified that he had administered a "field" test to plaintiff in 1980 to determine whether he could safely transfer locomotives to the depot, where signals had to be observed, and that plaintiff performed satisfactorily. According to Bonacina, the same test, which includes the viewing of color slides to identify various colors in a simulated field situation, is periodically

---

[5] In the Duochrome test, saturated red and saturated green lights are projected on a wall adjacent to one another and the examinee is asked to identify the colors. The Farnsworth test is not described in the record.

given to engineers over the age of 50 to ascertain if they can continue to distinguish colors. Meyers, however, testified that he did not believe that a field test could be used for entry level evaluations, because it would be impossible to duplicate all weather conditions.

In addition to that evidence, a retired engineer testified that, although he had failed the Ishihara test in 1977, he was allowed to continue working as an engineer until his retirement in 1978. He testified that rain or fog did not affect his ability to perceive whether a signal was red or green and that he had no difficulty differentiating red, green or amber either before or after he discovered that he could not pass the Ishihara. There was additional evidence that Southern Pacific had promoted to engineer a man who had failed the Ishihara in the pre-transfer examination. Meyers offered the explanation that he had misinterpreted the statement in the medical report on color perception "Ishihara 7/8 missed" to mean that the applicant had missed plates number 7 and 8 and that missing only two plates was not disqualifying.

We find persuasive Redfield's opinion that plaintiff's satisfactory performance on tests other than the Ishihara is a valid indication of his ability to make the necessary color differentiations required in a job in engine service. There is no indication that other individuals with similar color vision deficiencies employed in engine service have caused a safety hazard. Plaintiff satisfactorily completed a "field" test designed to test the color vision of engineers. The only evidence that plaintiff's failure on the Ishihara test requires a conclusion that plaintiff could not safely perform the job duties of fireman is the opinion of Meyers and, in evaluating the conflicting medical evidence, we give weight to the trial court's express finding that Meyers was extremely biased in favor of Southern Pacific. From our review of all the evidence in this record, we conclude that Southern Pacific has failed to establish to a reasonable probability that plaintiff's color vision deficiency precluded his satisfactory performance in engine service and that, therefore, it has failed to establish that passing the test was a BFOR.

Affirmed.