Gerard W. McCALL, Plaintiff–Appellee,

v.

CHESAPEAKE & OHIO RAILWAY COMPANY, Defendant–Appellant.

No. 86–1462.

United States Court of Appeals, Sixth Circuit.

Argued June 15, 1987.

Decided April 4, 1988.

Order on Denial of Rehearing July 24, 1988.

---

A.T. Lippert, Jr. (argued), Smith & Booker, P.C., Saginaw, Mich., for defendant-appellant.

Charles W. Palmer, Taylor, Mich., George R. Thompson (argued), Traverse City, Mich., for plaintiff-appellee.

Before: MERRITT, MARTIN and WELLFORD, Circuit Judges.

MERRITT, Circuit Judge.

The Chesapeake & Ohio Railway Company appeals a jury verdict awarding $328,-000 to plaintiff Gerard W. McCall as damages for a violation of the Michigan Handicappers' Civil Rights Act, Mich.Comp.Laws Ann. § 37.1101 *et seq.* (1985).[1] We hold that the Michigan statute required the jury to make the identical decision made by an arbitration board established pursuant to the Railway Labor Act, 45 U.S.C. § 153 Second (1982),[2] and that therefore the Mi-

---

1. The Handicappers' Act, in relevant part, provides:

   (1) An employee shall not:

   \* \* \* \* \* \*

   (b) Discharge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a handicap that is unrelated to the individual's ability to perform the duties of a particular job or position. Mich.Comp.Laws Ann. § 37.1202.

2. Section 153 Second of the Railway Labor Act provides that carriers, systems, or groups of carriers may, acting through their representatives, establish "system, group, or regional boards of adjustment for the purpose of adjusting and deciding disputes of the character specified in this section." These voluntarily established boards may, by agreement, resolve disputes which would otherwise be referable to the National Railroad Adjustment Board, which is established by 45 U.S.C. § 153 First. Because

chigan statute is preempted in this case by the Railway Labor Act. We therefore vacate the decision of the District Court, and remand with instructions to dismiss the case.

## I.

Plaintiff-appellee Gerard W. McCall was hired in 1956 by the Chesapeake & Ohio Railway Company (C & O) as a locomotive fireman. In 1961, he was qualified as an engineer. Although he did not begin working as an engineer immediately upon qualification due to lack of seniority, McCall worked regularly as an engineer from 1967 until June 13, 1983.

In 1969, when McCall was approximately 36 years old, he was diagnosed as suffering from adult onset diabetes mellitus. From 1969 until 1982, the diabetes was controlled with the use of oral hypoglycemic agents. By 1982 the effectiveness of the oral medication had lessened. McCall was hospitalized in January 1982 for conversion to treatment by insulin injections. McCall's doctor, Dr. William Hailer, provided him with a return to work slip which specified that McCall had been under his care for diabetes mellitus, conversion to insulin, and hypertension. McCall returned to work on February 8, 1982.

In June 1983, McCall was removed from service because he controlled his diabetes with insulin. (The record does not indicate why C & O was either unaware of or did not act on McCall's status as an insulin-requiring diabetic prior to that date.) McCall was told that C & O policy required that insulin-requiring diabetics not be permitted to drive mobile equipment, work in proximity to dangerous or moving equipment, work at unprotected elevations, or work alone. Because railroad engineers obviously work in close proximity to moving equipment, McCall was removed from service. At the request of the local, the chairman of the Brotherhood of Locomotive Engineers wrote a letter to the railroad requesting that McCall be returned to service. This letter was accompanied by a letter from Dr. Hailer stating his opinion that McCall's diabetes was under control and that McCall could return to work.

Under the collective bargaining agreement, an engineer who was medically disqualified could exercise his seniority to work as a fireman if he was physically qualified to do so. However, the railroad refused to allow McCall to work as a fireman because the same safety considerations were applicable.

Addendum 27 of the collective bargaining agreement provides for the appointment of a three member board to review findings of physical disqualification.[3] The company and the disqualified engineer each select one physician; the third physician is selected by the two other physicians. The

the national board has jurisdiction over disputes involving unions and grievances involving individual employees, "[t]he cases which may be considered by [a voluntarily established board] shall be defined in the agreement establishing it."

The Act provides that a voluntarily established board shall consist of one person designated by the carrier and one person designated by the representatives of the employees. If the two members of the board are "unable to agree upon an award disposing of the dispute or group of disputes they shall by mutual agreement select a neutral person to be a member of the board.... [A]wards shall be final and binding upon both parties to the dispute.... Compliance with such awards shall be enforcible by proceedings in the United States district courts in the same manner and subject to the same provisions that apply to proceedings for enforcement of compliance with awards of the Adjustment Board."

3. Addendum 27 applies specifically to locomotive engineers. It provides that when a carrier's chief medical examiner finds an engineer to be physically disqualified and the union does not agree that the engineer's condition justifies removal from service, an appeal may be made within 60 days. On appeal, a three member medical board examines the engineer. The board consists of the carrier's chief medical examiner, a physician selected by the union, and a third member agreed upon by the other two physicians. Finally, "[t]he findings and decisions of the majority of this medical board as to the physical fitness of the engineer to continue in service of the carrier shall be final and binding upon the carrier, the engineer, and the Brotherhood of Locomotive Engineers, but this does not mean that a change in physical condition will preclude a re-examination at a later time."

agreement provides that the findings of the medical board are final and binding. This dispute resolution structure is the type of voluntary adjustment board provided for by the Railway Labor Act, 45 U.S.C. § 153 Second (1982). A review board was established to review McCall's case; the board ruled 2–1 that McCall could not continue work as an engineer or fireman.

McCall then brought an action in state court alleging that C & O had violated the Michigan Handicappers' Civil Rights Act, Mich.Comp.Laws Ann. § 37.1101 *et seq.* (1985). The action was removed to federal court on diversity grounds. C & O moved to dismiss, asserting that the exclusive remedy available to McCall is the review board provided for in the Railway Labor Act. The motion was denied, and the suit went to trial. On March 14, 1986, a jury verdict was returned for McCall. He was awarded $328,000 in damages. After the District Court denied motions for judgment notwithstanding the verdict and for a new trial, C & O appealed.

On appeal, C & O argues that the federal act preempts the state cause of action. In the alternative, C & O argues that the jury verdict on McCall's Handicappers' Act claim should be reversed. Because we hold that the federal act preempts the state claim in this case, we do not reach the jury verdict issue.

## II.

C & O argues that this case is controlled by *Stephens v. Norfolk & W. Ry.*, 792 F.2d 576, *amended*, 811 F.2d 286 (6th Cir.1986). In *Stephens*, a railroad switchman was disqualified from further service with the railroad after two doctors diagnosed him as having degenerative disc disease, a defect which was considered disqualifying by the railroad. The collective bargaining agreement in *Stephens* was similar but not identical to the one in this case. The railroad refused to appoint a full three doctor panel because Stephens' doctor and the railroad's doctor both agreed on the diagnosis, although Stephens' doctor did state that Stephens was fit for work despite his disease. Stephens' union filed a complaint with a

board of adjustment, which concluded that the railroad had acted reasonably and within the terms of the collective bargaining agreement in establishing physical standards for its employees. Stephens then filed a complaint in federal court alleging that the railroad had violated the Michigan Handicappers' Act. The district court dismissed his complaint, relying on the exclusive jurisdiction of the National Railroad Adjustment Board and the failure of Stephens to state a claim under the Handicappers' Act.

This Court held that the dispute was minor and thus within the exclusive jurisdiction of the federal administrative board. 792 F.2d at 579–81. *See Local 1477 Transp. Union v. Baker*, 482 F.2d 228, 230 (6th Cir.1973) (labor dispute is classified as minor "if the disputed action of one of the parties can 'arguably' be justified by the existing agreement or, in [a] somewhat different statement, if the contention that the labor contract sanctions the disputed action is not 'obviously insubstantial'...."). We declined to hold in *Stephens* that Stephens was discharged because of a handicap and we therefore did not address the question of preemption of the state handicap act by the federal act. In footnote 9 of the *Stephens* opinion, added after publication of the original opinion, we stated:

This case does not involve discharge or discrimination against Stephens because of a handicap, and it does not in any way conflict with *Colorado Anti-Discrimination Commission v. Continental Airlines*, 372 U.S. 714 [83 S.Ct. 1022, 10 L.Ed.2d 84] (1963). There are three issues to be decided in this case. First, whether the physical examination was legitimate. Second, whether Stephens could pass the examination. Third, if, as the trial court held, Stephens' complaint failed to state a claim on which relief could be granted under the Handicapper's Act, whether Stephens' unsuccessful attempt to rely on that Act could take his claim outside the exclusive jurisdiction of the NRAB.

811 F.2d at 286.

This case is not controlled by *Stephens* because the two acts did not come into

direct conflict in *Stephens*, as they do here. In this case, a jury found that the railroad violated the state act, and a judgment was entered against the railroad. In *Stephens*, however, the issue was whether Stephens' complaint alleged a misinterpretation of the collective bargaining agreement. *Stephens* thus holds only that the federal board has exclusive jurisdiction over claims alleging breaches of collective bargaining agreements.

Although the difference in the issues presented in *Stephens* and this case may appear to be minor, they are not insubstantial. In *Colorado Anti–Discrimination, supra,* the Supreme Court held that a state statute prohibiting racial discrimination in employment was not preempted by the Railway Labor Act. The Court stated:

> Nothing in the Railway Labor Act or in our cases suggests that the Act places upon an air carrier a duty to engage only in fair nondiscriminatory hiring practices. The Act has never been used for that purpose, and we cannot hold it bars Colorado's Anti–Discrimination Act.

372 U.S. at 724, 83 S.Ct. at 1027. In *Stephens*, the *Colorado Anti–Discrimination* issue was not before us, because *Stephens* was controlled by the narrow principle that a claim involving interpretation of the collective bargaining agreement is governed exclusively by the Railway Labor Act. In this case, we are squarely presented with the issue of whether a state antidiscrimination statute can be preempted by the federal act. While *Stephens* may provide guidance in this case, it is therefore not controlling.

*Atchison, T. & S.F. Ry. v. Buell,* — U.S. ——, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987) is also pertinent. In *Buell,* the Court held that a railroad employee is entitled to bring suit under the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51 *et seq.,* even if the employee had the opportunity to pursue a labor grievance under the Railway Labor Act. The Court stated:

> This Court has, on numerous occasions, declined to hold that individual employees are, because of the availability of

arbitration, barred from bringing claims under federal statutes. *See e.g., McDonald v. West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984); *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Although the analysis of the question under each statute is quite distinct, the theory running through these cases is that notwithstanding the strong policies encouraging arbitration, "different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." *Barrentine, supra,* 450 U.S. at 737, 101 S.Ct. at 1443.

107 S.Ct. at 1415.

Although *Buell* stands for the proposition that claims under substantive statutory rights may be decided outside of the labor arbitration machinery, it should not be read to overrule our decision in *Stephens* or to dictate a holding in this case that the state act is preempted. FELA, the statute involved in *Buell,* is a *federal* statute. Likewise, the statutes in the cases cited by the Court were all federal statutes. *Barrentine,* 450 U.S. 728, 101 S.Ct. 1437, involved a Fair Labor Standards Act claim. *McDonald,* 466 U.S. 284, 104 S.Ct. 1799, was an action brought under 42 U.S.C. 1983. *Gardner–Denver,* 415 U.S. 36, 94 S.Ct. 1011, was a Title VII case. In the instant case, we are concerned with a *state* statute. The issue is not the relationship between two federal statutes passed by Congress; it is the relationship between a federal statute and a state statute.

In *Stephens* we anticipated the result in *Buell.* Footnote 8 of the *Stephens* opinion pointed out that the case involved a conflict between a state statute and a federal statute, rather than a conflict between two federal statutes. We noted that precedent in other circuits supported the proposition that the interaction of two *federal* statutory schemes rebuts the exclusive jurisdiction presumption of the railway act. It is

that proposition that the Supreme Court later adopted in *Buell*. However, we noted in *Stephens* that there was no authority for holding that a claim grounded on a *state* cause of action can rebut the exclusive jurisdiction presumption of the Railway Labor Act. 792 F.2d at 581 n. 8. The reasoning expressed in *Stephens* is applicable here. *Buell's* holding that FELA claims are not precluded by the railway act necessarily turned on an examination of congressional intent in enacting both the FELA and the Railway Labor Act. Here, McCall's claim is grounded in a state statutory cause of action, but the holding in *Buell* was that Congress did not intend for the railway act to repeal any part of the FELA. Our task in this case is to determine whether the state act conflicts with a federal law. Thus, although in *Buell* the intent of Congress in enacting both statutes was examined, the only congressional intent to be examined in this case is that underlying the federal railway act.

### III.

Because neither *Stephens* nor *Buell* controls this case, we must look to the policies underlying railway labor preemption in order to determine whether the state claim is preempted here.

Preemption decisions are decisions interpreting the Supremacy Clause and must therefore be guided by respect for the separation and allocation of power among the various tribunals of the state and federal governments in our federal system. *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S.

504, 522, 101 S.Ct. 1895, 1905, 68 L.Ed.2d 402 (1981). In preemption analysis,

" '[t]he purpose of Congress is the ultimate touchstone.' " Where the pre-emptive effect of federal enactments is not explicit, "courts sustain a local regulation 'unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.' "

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747–48, 105 S.Ct. 2380, 2393–94, 85 L.Ed.2d 728 (1985) (citations omitted).

In determining the preemptive effect of the railway act, we look not only to other railway act cases but to preemption decisions premised on other federal labor statutes. Although the preemptive effect of statutes such as the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.*, and the Labor Management Relations Act (LMRA), 29 U.S.C. § 141 *et seq.*, cannot be "imported wholesale into the railway labor arena," *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969), courts may look to the construction of other federal labor statutes for assistance in construing this act. *Id.* Of the four judicially developed preemption doctrines, *see Jones v. Truck Drivers Local Union No. 299*, 838 F.2d 856, 868–875 (6th Cir. Feb. 3, 1988) (Merritt, J., concurring in part and dissenting in part), two are involved in this case.[4]

---

**4.** The two types of preemption not involved in this case are *Brown* preemption and *Machinists* preemption.

*Brown* preemption, *see Brown v. Hotel and Restaurant Employees Local 54*, 468 U.S. 491, 503, 104 S.Ct. 3179, 3186, 82 L.Ed.2d 373 (1984) provides that the states may not regulate conduct that is actually protected by federal law. As there is no federal right to discriminate on the basis of a handicap, there can be no argument that the state act is preempted by a conflict with a federally guaranteed substantive right.

*Machinists* preemption, *see Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), operates when a state seeks to alter the economic power of labor or management. Although the

*Machinists* case was an NLRA case, its rationale that Congress established a balance of competing powers between labor and management with which states may not interfere seems applicable in some ways in the railway labor field. One might argue that the Handicappers' Act has altered the balance of power between labor and management because, prior to the passage of the Handicappers' Act, labor and management were free to negotiate the issue of physical qualifications for employment, and the Michigan statute has imposed a reasonableness test on those negotiations. However, *Machinists* preemption has been described as proscribing state regulation of "conduct that was to remain a part of the self-help remedies left to the combatants in labor disputes." *Belknap v. Hale*, 463 U.S. 491, 499, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798

### A. *Interpretation of Collective Bargaining Agreements*

Under the Railway Labor Act, disputes involving the interpretation of collective bargaining agreements are characterized as "minor." *See Baker,* 482 F.2d at 230. In *Andrews v. Louisville & N.R.R.,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), the Supreme Court held that because the act provided a mechanism for the resolution of minor grievances, an employee could not bring a state wrongful discharge action alleging that he was fired in violation of a collective bargaining agreement. The act's dispute resolution procedure was held to be mandatory; the situation was one in which "the Act makes the federal administrative remedy exclusive...." *Id.* at 325, 92 S.Ct. at 1565.

This type of preemption is in some ways analogous to preemption by § 301 of the LMRA, 29 U.S.C. § 185(a). Section 301 authorizes direct suit in the district courts for violations of collective bargaining agreements. Whenever a state rule "purports to define the meaning or scope of a term" in a collective bargaining agreement, the state rule is preempted by the federal common law promulgated pursuant to § 301. *Allis–Chalmers v. Lueck,* 471 U.S. 202, 210, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985). *See also Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 103–04, 82 S.Ct. 571, 576–77, 7 L.Ed.2d 593 (1962); Field, *Sources of Law: The Scope of Federal Common Law,* 99 Harv.L.Rev. 883 (1986).

If McCall alleged in this case that his removal from service violated the terms of the collective bargaining agreement and violated the state act, his claim would clearly be preempted as "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract." *Lueck,* 471 U.S. at 220, 105 S.Ct. at 1916. McCall asserts his claim as one which is independent of the collective bargaining agreement. He claims that regardless of the terms of the agreement, C & O cannot under Michigan law discriminate against him because he is an insulin-requiring diabetic.

■ Statutes that purport to establish rights that are independent of rights under a collective bargaining agreement are not necessarily preempted even if they relate to the agreement in some way. *See Lueck,* 471 U.S. at 212–13, 105 S.Ct. at 1911–12. In this manner the policies of *Colorado Anti–Discrimination, supra,* are vindicated. An employer cannot simply hide behind the arbitration provisions of a collective bargaining agreement to bypass his or her employees' statutory right not to be discriminated against. Michigan clearly has an interest in regulating employment discrimination. *Cf. San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 243–44, 79 S.Ct. 773, 778–79, 3 L.Ed.2d 775 (1959) (if activity state seeks to regulate is "merely peripheral concern" of federal statute or touches "interests ... deeply rooted in local feeling and responsibility," statute will not be held preempted absent "compelling congressional direction."). We cannot hold that Michigan's interest in eradicating employment discrimination must give way to the federal interest in regulating labor-management relations in the railway context merely because the rights protected under the state act relate to the collective bargaining agreement in some way. A stronger nexus must exist for the state act to be preempted.

### B. *Frustration of the Federal Railway Dispute Resolution Scheme*

■ Although the existence of a relationship between rights regulated by the state and the collective bargaining agreement is not in itself enough to mandate preemp-

(1983) (citations omitted). Thus *Machinists* preemption might be construed to be applicable only to the type of conduct which gives rise to "major" disputes. (*See Baker,* 482 F.2d at 230, for distinction between major and minor disputes.) However, we need not decide the scope of *Machinists* preemption. The question whether Michigan has altered the balance of power between labor and management by imposing a reasonableness requirement on collectively bargained physical job qualifications collapses in this case into the question whether the arbitration board has the power to decide if an employee is physically qualified to perform the duties of his or her job. This question is discussed in part III. B., *infra.*

tion, the strong similarity between the inquiry made by the arbitration board and the inquiry made by the jury in the state cause of action requires that the Michigan statute be preempted in this case.

Section 153 Second of the railway act allows railroads and labor unions to voluntarily establish boards of adjustment to resolve disputes. The collective bargaining agreement in this case established just such a board, and thus its decision was binding on the railroad and McCall. The board was empowered to make findings and reach a decision as to McCall's physical ability to continue in service. The jury in McCall's state action had to decide whether McCall's diabetes is a handicap that is unrelated to his ability to perform the duties of his job. Thus, the arbitration board and the jury had to make essentially the same decision—whether McCall is physically able to perform the duties of his job. The state cause of action is therefore preempted since it is "based on a matrix of facts which are inextricably intertwined with the grievance machinery of the collective bargaining agreement and of the R.L.A.," *Stephens*, 792 F.2d at 580, *quoting Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367, 1369 (9th Cir.), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). If McCall can litigate an issue on the merits before an arbitration board created pursuant to § 153 Second and a collective bargaining agreement and then relitigate the identical issue in an independent judicial proceeding, the purposes of railway labor arbitration would be frustrated. *See Andrews*, 406 U.S. at 325, 92 S.Ct. at 1565.

The NLRA doctrine that has come to be known as *Garmon* preemption, while not completely transferable to the railway labor context, provides the reason why the state claim is preempted in this case. The federal act was intended to serve the interests of railroad employees by creating a statutory scheme providing for the final settlement of grievances by a tribunal composed of people experienced in the railroad industry. *Union Pacific R.R. Co. v. Price*, 360 U.S. 601, 614, 79 S.Ct. 1351, 1358, 3 L.Ed.2d 1460 (1959). Although the structure of the arbitration process under the federal act is somewhat different than the grievance process under the NLRA, both statutes envision binding administrative proceedings into which virtually all individual labor-management disputes are directed. In the NLRA context, *Garmon* preemption takes this concern into account. "When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *San Diego Building Trades Council v. Garmon*, 359 U.S. at 245, 79 S.Ct. at 780. If McCall's dispute with the railroad had been governed by the arbitration provisions of § 153 First, *Garmon*-type preemption would clearly apply, since § 153 First provides for arbitration before the National Railroad Adjustment Board. Entrusting interpretation of the statute to a centralized administrative agency serves to promote uniformity in national labor policy. *Cf. Garmon*, 359 U.S. at 242–43, 79 S.Ct. at 778–79.

The national uniformity argument is not as compelling when, as in this case, the arbitration is conducted under the authority of § 153 Second, which allows labor and management to bypass the national board by establishing system, group, or regional boards. *Garmon*-type preemption's purpose of preventing conflicting interpretations of a labor statute is less likely to be achieved in a system in which a number of arbitration boards are empowered to make final binding decisions. However, the possibility of varying substantive interpretations of the federal act by different arbitration boards is not that great; unlike the NLRA, which defines employee rights and unfair labor practices, the railway act contains few substantive provisions to be interpreted. Instead, the railway act leaves the establishment of most substantive rights to the collective bargaining process and merely provides mechanisms for enforcing those rights. However, the policy of the railway act is to channel dispute resolution to either the national board or the various voluntarily established boards. The exercise

of state power over an area of activity specifically relegated to the railway act dispute resolution process therefore causes a danger of conflict with national labor policy great enough to mandate preemption. *Cf. Garmon,* 359 U.S. at 246, 79 S.Ct. at 780. The potential for conflict is realized in this case: the decision of the arbitration board and the decision of the jury on the issue of McCall's ability to continue working as an engineer are in direct conflict. If the federal dispute resolution mechanism is to have any force, juries cannot be allowed to second-guess the decisions of arbitration boards.

This reasoning is reinforced by the principle established almost 30 years ago in the "Steelworkers Trilogy." *See United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In these cases, the Court gave great deference to the arbitration process. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Steelworkers v. Enterprise Corp.,* 363 U.S. at 596, 80 S.Ct. at 1360. *See also United Paperworkers Int'l Union v. Misco, Inc.,* —— U.S. ——, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) (holding that courts cannot reconsider the merits of an arbitrator's award).

## C. *The Relationship Between Preemption and Colorado Anti–Discrimination*

The federal act preempts the state claim in this case, however, only if such a result does not conflict with *Colorado Anti–Discrimination, supra.* Just as nothing in the federal act suggests that a carrier has a duty not to discriminate on the basis of race, *see Colorado Anti-Discrimination,* 372 U.S. at 724, 83 S.Ct. at 1027, nothing in the act suggests that a carrier cannot discriminate on the basis of handicap. Thus, under the reasoning of *Colorado Anti–Discrimination,* Michigan may be able to regulate the railroad in this manner.

Additionally, *Garmon*-type preemption does not necessarily apply to all exercises of state power that may interfere with national labor policy:

> [D]ue regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the States of power to regulate where the activity regulated was merely a peripheral concern of the Labor Management Relations Act. Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.

*Garmon,* 359 U.S. at 243–44, 79 S.Ct. at 778–79 (citations and footnotes omitted).

This case does not fall within the ambit of either *Colorado Anti–Discrimination* or the exceptions to *Garmon*-type preemption, but those considerations do dictate that our result be a narrow one. Preempting the state claim in this case does not conflict with *Colorado Anti–Discrimination* because the statute at issue in that case regulated racial discrimination, conduct that is not by any construction a subject for collective bargaining and arbitration. The Handicappers' Act, however, is a different type of statute. Although the *purpose* of the statute—eliminating discrimination on the basis of handicap—may be for some as laudable as the purpose of the Colorado statute, the methodology employed in determining statutory violations is necessarily different from the methodology employed in ascertaining whether an employer has discriminated on the basis of race. In the case of a statute barring racial discrimination, the only inquiry made is whether the motivation for the challenged action was the employee's race. In the case of the Handicappers' Act, the inquiry must go further: once it is established that the challenged action was taken on account of the employee's physical condition, it must also be determined that the employee's physical condition is unrelated to job performance. It is the necessity of the second level of inquiry which leads to our conclusion that the state claim is preempted in this case. The parties in this case committed the determination of whether a particular physical condition af-

fects an individual's ability to perform the duties of an engineer or fireman to the arbitration process. *See* n. 1, *supra.* The inquiry made by the arbitration board—whether McCall's insulin-requiring diabetic condition allows him to perform the duties of an engineer or fireman—is the same factual inquiry made by the jury in McCall's Handicappers' Act suit. The arbitration board did not decide that McCall could not keep his job regardless of whether his physical condition affected his job performance; it decided that he could not keep his job because his physical condition would not allow him to perform his duties. Only if the board had made the former decision would a conflict with the principles of *Colorado Anti–Discrimination* present itself.

We give deference judicially to the arbitration process. The state legislation in this case relates directly to the employee's ability to perform and contravenes the process set out by Congress and agreed to by the parties through collective bargaining (Addendum 27) to decide the "physical fitness of the engineer to continue in service of the carrier," which is itself a matter subject to extensive federal regulation.

The principle of federalism would seem to support the outcome reached in this case. Michigan cannot superimpose a state remedy upon a regulated interstate carrier engaged in commerce whose employment relationships with its employees, including disputes about ability to perform an important job function concerning public safety, are governed by federal legislation providing for fair and binding arbitration. Anti-discrimination legislation that does not relate to medical ability to perform a job (such as the engineer's job here involved) may call for a different result:

> ... [C]ourts must examine closely the facts of each case to determine whether the dangers and hardships of diverse regulation justify foreclosing a State from the exercise of its traditional powers.

*Colorado Anti–Discrimination,* 372 U.S. at 719, 83 S.Ct. at 1024. It should also be noted that in *Colorado Anti–Discrimination* it was *not* contended by the air carrier that the Colorado statute was "in direct conflict with federal law" or "that it stands as an obstacle to the full effectiveness of a federal statute." *Id.* at 722, 83 S.Ct. at 1026. The Supreme Court in that case was

not called upon to conclude "that the purpose of the federal statute would to some extent be frustrated by the state statute." *Id.*

■ The exceptions to *Garmon*-type preemption are inapplicable for similar reasons. Although it may well be that the eradication of discrimination against handicapped persons is an interest "deeply rooted in local feeling and responsibility," we do not hold that the state act is preempted by the federal act in all cases; and we do not address the issue of what effect, if any, the state act would have on an arbitration that did not consider whether the employee was physically able to perform the duties of his or her job. We simply hold that when an arbitration board established pursuant to § 153 Second is required by the collective bargaining agreement to make the same factual inquiry regarding physical ability to perform a job as would be made under the state act, the federal dispute resolution process is the sole remedy. The activity being regulated by Michigan in this case is factfinding by the arbitration board; this is not a "peripheral concern" of the federal act but is central to the dispute resolution process. There is not merely a risk of infringement on an area of primary federal concern in this case, there is a direct conflict. Therefore, the state claim is preempted.

### IV.

■ In his brief, McCall implies that the process by which the third member of the arbitration board that decided his case was selected was tainted, and that the third member was not neutral. He also argues that the arbitration board applied a blanket rule which disqualified all insulin-requiring diabetics from train and engine service.

Although McCall's arguments on these points may have merit, he is foreclosed from raising them here. The collective bargaining agreement provides that the arbitration board shall make a decision as to the physical fitness of an individual engineer. McCall's only avenue of review for the decision of the arbitration board is set out in § 153 First (q), which also applies to boards established under the authority of § 153 Second:

> If any employee ... is aggrieved by the failure of any division of the Adjustment Board to make an award in a dispute

referred to it, or is aggrieved by any of the terms of an award, ... then such employee may file in any United States district court [with personal jurisdiction] a petition for review of the division's order. . . . The court shall have jurisdiction to affirm the order of the division, or to set it aside, in whole or in part, or it may remand the proceedings to the division for such further action as it may direct. On such review, *the findings and order of the division shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division, for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order.* The judgment of the court shall be subject to review as provided in sections 1291 and 1254 of title 28.

45 U.S.C. § 153 First (q) (emphasis added). Thus, if McCall felt he received unfair treatment from the arbitration board, or if he felt the arbitration board violated the collective bargaining agreement by not considering the particulars of his case, he could have sought judicial review of the board's decision. He could not, however, circumvent the finality of the board's decision by attempting to bring the same claim under a state cause of action. *See Stephens, supra.*

The judgment of the District Court is vacated, and the case is remanded with instructions to dismiss the plaintiff's claim.

## ORDER ON REHEARING

The Court declines to order rehearing or reconsideration in this case based upon plaintiff-appellee's submission of *Lingle v. Norge Division of Magic Chef, Inc.,* a case decided June 6, 1988, by the Supreme Court, —— U.S. ——, 108 S.Ct. 1877, 100 L.Ed.2d ——. The Court has reviewed the slip opinion submitted and concludes that the *Lingle* case does not dictate a contrary result. In the instant case the state handicap action can only succeed under the Supremacy Clause of the Constitution if the collective bargaining agreement adopted under the Railway Labor Act is interpreted to mean that the employee's handicap is unrelated to job performance. If the hand-

icap is job related, management has authority under the collective bargaining agreement to terminate. Thus the state law handicap action necessarily requires an interpretation of the collective bargaining agreement concerning the job relatedness of the employee's handicap. *Lingle* holds that in such cases requiring contract interpretation the state law action must be preempted.

Accordingly, rehearing is DENIED.