USCA1 Opinion

 

 August 5, 1992 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1086 WILLIAM J. O'BRIEN, Plaintiff, Appellant, v. CONSOLIDATED RAIL CORPORATION, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Lay,* Senior Circuit Judge, ____________________ and O'Scannlain,** Circuit Judge. _____________ ____________________ Philip G. Boyle for appellant. _______________ Gary D. Buseck with whom Robert L. Farrell and Parker, Coulter, _______________ __________________ ________________ Daley & White were on brief for appellee. _____________ ____________________ ____________________ _____________________ * Of the Eighth Circuit, sitting by designation. ** Of the Ninth Circuit, sitting by designation. O'SCANNLAIN, Circuit Judge: We must decide whether a state ___________ law providing for physical handicap discrimination claims against employers is preempted by the Railway Labor Act ("RLA"), 45 U.S.C. 151-88. I In August 1985, William J. O'Brien was laid off by Consolidated Rail Corporation ("Conrail") from his position as yardmaster in the Boston area. O'Brien declined Conrail's offer of a position in Springfield, Massachusetts and instead applied for a stevedore position with Conrail, also in the Boston area. Although such position was already filled, O'Brien had eight and one-half years of seniority with Conrail and under the collective bargaining agreement he was entitled to "bump" the less senior employee filling the position. O'Brien was born without a right hand. The supervisor of the stevedoring operation told O'Brien he was disqualified from being a stevedore because he was physically incapable of performing the duties of a stevedore. O'Brien requested a field test to refute the supervisor's contention. Six Conrail employees conducted the field test, and concluded that O'Brien could not safely perform all of the duties of a stevedore. In particular, the six-member committee determined that O'Brien would not be able to climb ladders safely in adverse weather, and would not be able to handle safely the forty pound "bridge plates" used in the stevedoring operation. O'Brien filed a grievance under the procedures provided by the collective bargaining agreement, claiming that Conrail -2- violated the antidiscrimination provision of such agreement. The grievance was first denied by the Manager-Labor Relations at Conrail, and later by Conrail's Senior Director-Labor Relations. O'Brien then submitted the matter to the National Railroad Adjustment Board ("NRAB"), which was created by the RLA to resolve labor disputes in the railroad industry. The NRAB denied O'Brien's grievance. O'Brien also filed a complaint with the Office of Federal Contract Compliance Programs ("OFCCP"), which investigates complaints of unlawful employment discrimination lodged against federal contractors such as Conrail. The OFCCP determined that Conrail had not violated the antidiscrimination provisions of its contract with the government. O'Brien sought reconsideration by the Director of the OFCCP, who affirmed the determination of the OFCCP. Eventually, O'Brien was called back from lay off by Conrail to his former yardmaster job. In January 1988, however, O'Brien was again laid off. O'Brien wrote to the stevedoring supervisor requesting to "bump" an employee in a stevedore position, and the supervisor replied that "Conrail's prior determination still stands." On March 14, 1988, after he had requested the stevedore position but before his request was denied, O'Brien filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"), a prerequisite to bringing an action in court for a violation of the state antidiscrimination law. O'Brien alleged -3- that Conrail had violated Massachusetts General Laws Chapter 151B ("Chapter 151B"), which prohibits discrimination on the basis of physical or mental handicap, if the handicapped person is "capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required . . . would impose an undue hardship to the employer's business." Mass. Gen. L. ch. 151B, 4. The MCAD permitted O'Brien to file suit in Massachusetts state court, and he did so.1 Conrail petitioned to remove the case to United States district court, alleging that the district court had diversity jurisdiction and jurisdiction under 28 U.S.C. 1337(a), which grants federal jurisdiction over a "civil action . . . arising under any Act of Congress regulating commerce." The district court granted the removal petition. Conrail then moved for summary judgment on the following grounds: (1) O'Brien's claims were preempted by the RLA, (2) O'Brien's claims were preempted by Section 503 of the Rehabilitation Act, (3) the adverse determinations of the NRAB and the OFCCP had preclusive effect on O'Brien's claims, and (4) O'Brien's claim under Chapter 151B was barred by a six month ____________________ In his state court complaint, O'Brien also alleged breach of the covenant of good faith and fair dealing in his employment contract and violation of his rights under the Massachusetts Constitution, Amendment Article 114. On the recommendation of the magistrate judge, these counts were dismissed by the district court, and O'Brien does not challenge such dismissals on appeal.1 -4- statute of limitations. A hearing on the motion was held before U.S. Magistrate Judge Marianne Bowler. The magistrate judge recommended that summary judgment be granted for Conrail on all the grounds urged by Conrail except the statute of limitations theory. The district court adopted the recommendations of the magistrate judge in whole and entered summary judgment for Conrail. O'Brien timely appealed. II O'Brien argues that the district court erred in determining that his claim was barred because his state statutory rights under Chapter 151B are independent of and exceed his rights under the RLA and the collective bargaining agreement with Conrail. O'Brien contends that the resolution of his claim under Chapter 151B "hinge[s] upon the meaning to be given the terms of the statute involved, and not those within the collective bargaining agreement," and thus that the RLA and the collective bargaining agreement are simply not implicated, let alone preemptive. A Preemption doctrine is founded on Article VI, clause 2 of the Constitution, which states that "the Laws of the United States . . . shall be the supreme Law of the Land." Under the Supremacy Clause, "state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid." Wisconsin Pub. Intervenor v. Mortier, 111 S. Ct. 2476, ____________________________________ 2481 (1991) (quoting Gibbons v. Ogden, 22 U.S. 1, 71 (1824)). ________________ Thus, the mere fact that O'Brien's cause of action under Chapter -5- 151B is "independent" of the RLA says nothing about whether such action is preempted by the RLA. Indeed, in any case where preemption doctrine is applied, there will be a state law cause of action "independent" of federal law. Rather, the critical issue is whether the state law, Chapter 151B, "interfere[s] with" the federal RLA. "'[P]reemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" Morales v. Trans World Airlines, Inc., 112 S. Ct. _______________________________ 2031, 2036 (1992) (quoting FMC Corp. v. Holliday, 111 S. Ct. 403, _____________________ 407 (1990)). Where, as here, express preemption is absent, _______ the challenged state law must yield when it "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" . . . [or] where the state law "actually conflicts with federal law." . . . Such a conflict arises where it is physically impossible to comply with both the federal and the state law or where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Pedraza v. Shell Oil Co., 942 F.2d 48, 51 (1st Cir. 1991) ____________________________ (quoting English v. General Elec. Co., 110 S. Ct. 2270, 2275 ____________________________ (1990)), cert. denied, 112 S. Ct. 993 (1992). Hence, we _____________ consider whether the RLA evinces a congressional intent to occupy the field of railroad labor relations and whether separate state causes of action such as Chapter 151B undermine the "full purposes and objectives of Congress" in enacting the RLA. -6- This court has not previously had occasion to determine the scope of preemption under the RLA. We have, however, examined preemption under the Labor Management Relations Act ("LMRA"), 29 U.S.C. 141-87. See Jackson v. Liquid ___ __________________ Carbonic Corp., 863 F.2d 111 (1st Cir. 1988), cert. denied, ______________ _____________ 490 U.S. 1107 (1989). The LMRA and the RLA are similar in many respects: "[a]lthough the preemptive effect of . . . the Labor Management Relations Act . . . cannot be 'imported wholesale into the railway labor arena,' courts may look to the construction of other federal labor statutes for assistance in construing [the RLA]." McCall v. Chesapeake & _______________________ Ohio Ry. Co., 844 F.2d 294, 299 (6th Cir.) (quoting _______________ Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., ____________________________________________________________ 394 U.S. 369, 383 (1969)), cert. denied, 488 U.S. 879 (1988). ____________ In Jackson, an employee challenged drug testing by his employer under Massachusetts' privacy laws. Jackson, 863 _______ F.2d at 113. The employer contended that the employee's Massachusetts causes of action were barred, state law having been preempted by the federal LMRA. Id. The court observed __ that "under state law, Massachusetts would look to the [collective bargaining] Agreement to discern the scope of the privacy right which [the employee] was attempting to assert." Id. at 120. The court then held that "[b]ecause resolution __ of [the employee's] state-law claims 'requires the interpretation of a collective bargaining contract,' . . . it follows inexorably, as night unto day, that [the LMRA] -7- preempts maintenance of the suit in its present form." Id. at 122 (quoting Lingle v. Norge Division of Magic Chef, Inc., ____________________________________________ 108 S. Ct. 1877, 1883 n.8 (1988)). We believe that the holding of Jackson is equally applicable to asserted RLA preemption. The Jackson court concluded that to allow state law claims arising out of the employment relationship to be brought in court would undermine the scheme for labor dispute resolution established by Congress. We are mindful of the need to preserve the central role of arbitration in our system of industrial self-government. . . . The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace. Grievance and arbitration are important cogs in the machinery. A plaintiff should not be allowed to bypass the grievance procedures established by the labor contract in a case where his claims are so clearly dependent on interpretation of the terms of that contract. Allowing such an end run would surely undermine the structure of industrial self-government. Id. at 121-22 (quotations and citations omitted). __ Such concerns are equally present here. The RLA established a comprehensive conflict resolution procedure for railroad labor disputes. The RLA divides disputes into major disputes, those relating to the formation or existence of collective bargaining agreements, and minor disputes, which concern rights under an existing collective bargaining agreement. See Consolidated Rail Corp. v. Railway Labor _____________________________________________ -8- Exec. Ass'n, 109 S. Ct. 2477, 2480 (1989). "In the event of ____________ a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation." Id. In the __ event such mediation fails, the RLA provides for arbitration of major disputes. Id. at 2480 n.3. "A minor dispute in the __ railroad industry is subject to compulsory and binding arbitration before the National Railroad Adjustment Board . . . . The Board . . . has exclusive jurisdiction over minor disputes." Id. at 2480-81. __ Thus, the RLA "envision[s] binding administrative proceedings into which virtually all individual labor- management disputes are directed." McCall, 844 F.2d at 301. ______ The RLA's procedures were designed for quick and efficient dispute resolution. Union Pac. Ry. v. Sheehan, 439 U.S. 89, _________________________ 94 (1978) (per curiam). "The federal act was intended to serve the interests of railroad employees by creating a statutory scheme providing for the final settlement of grievances by a tribunal composed of people experienced in the railroad industry." McCall, 844 F.2d at 301. ______ As in the case of the LMRA, to permit litigation in court of state law claims connected with the collective bargaining agreement would undermine the purposes behind the RLA. "If the federal dispute resolution mechanism is to have any force, juries cannot be allowed to second-guess the decisions of arbitration boards." Id. at 302. Congress' __ intent that industry-based grievance and arbitration -9- proceedings be used to resolve labor-management disputes in the railroad industry would be frustrated if employees (or employers) could bring actions requiring interpretation of the collective bargaining agreement in court, based on state law. Costly litigation would replace efficient grievance and arbitration procedures. B Having concluded that the preemption rule of Jackson _______ governs here, we turn to applying it. Would resolution of O'Brien's physical handicap discrimination claim under Chapter 151B "require[] interpretation of a collective bargaining contract?" We believe it would.2 In order to determine whether Conrail had unlawfully discriminated against O'Brien, we would first have to ascertain whether O'Brien was otherwise eligible for the stevedore position he sought. That is, aside from his handicap, would O'Brien be eligible? To answer this question we would have to resort to the collective bargaining agreement. O'Brien was laid off from his job as yardmaster in the Boston area, but Conrail offered him another position in Springfield, Massachusetts, where O'Brien had worked before. Further, no stevedore positions were vacant in the ____________________ 2 O'Brien argues that Chapter 151B holds Conrail to a different and higher standard of conduct than Conrail's duties under the collective bargaining agreement because Chapter 151B contains a "reasonable accommodation" requirement. We do not need to decide whether that is correct because we conclude to the extent that O'Brien's state law claim requires interpretation of the collective bargaining agreement such claim is preempted under Jackson. _______ -10- Boston area. Thus, as a threshold issue to determine O'Brien's contractual eligibility for the job, we would need to interpret the collective bargaining agreement to determine whether it entitled O'Brien to refuse to return to Springfield, and whether it entitled O'Brien to "bump" the present holder of the stevedore position. More fundamentally, addressing the merits of O'Brien's claim of physical handicap discrimination would require us to assess O'Brien's fitness and ability to perform safely the functions of a stevedore. Yet an employee's fitness and ability are governed by the rules and procedures contained in the collective bargaining agreement. Rule 49 of the collective bargaining agreement sets forth the method by which an employee's physical fitness to perform his job is determined. Rule 50 describes Conrail's obligations to accommodate disabled and incapacitated employees. Perhaps the best indication that fitness and ability are the subject of the collective bargaining agreement is the very grievance that O'Brien brought under this collective bargaining agreement on the issue of his fitness and ability to be a stevedore. Chapter 151B requires a court to determine whether the plaintiff is a "qualified handicapped person," but this determination would be impossible to make without reference to the collective bargaining agreement. Hence, we hold, following Jackson, O'Brien's claim under _______ Chapter 151B is barred because resolution of his claim would -11- require interpretation of the collective bargaining agreement.3 This holding is not inconsistent with Colorado ________ Anti-Discrimination Comm'n v. Continental Air Lines, Inc., ____________________________________________________________ 372 U.S. 714 (1963), which held that a state racial ______ discrimination claim statute was not preempted by the RLA. Resolution of the question of whether an employer was engaged in racial discrimination would not require interpretation of the collective bargaining agreement. As the Sixth Circuit has noted, "racial discrimination [is] conduct that is not by any construction a subject for collective bargaining and arbitration." McCall, 844 F.2d at 302. ______ "In enacting [the RLA], Congress endeavored to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes ____________________ 3 The New Jersey Supreme Court has recently held that "[a]llowing [an aggrieved employee] to bring his claim of handicap discrimination before the courts would interfere impermissibly with Congress's intent that the Adjustment Boards be the sole arbiter of claims related to railroad 'rules and working conditions.'" Maher v. New Jersey Transit ___________________________ Rail Oper., Inc., 593 A.2d 750, 765 (N.J. 1991). Similarly, ________________ the California Court of Appeal has stated that "[i]f an employee's lack of fitness to perform his job is made arbitrable under the parties' collective bargaining agreement, the present action is preempted insofar as it alleges discrimination based on physical handicap because it raises an issue determinable solely under procedures established by the RLA." Evans v. Southern Pacific Trans. Co., 262 Cal. Rptr. ______________________________________ 416, 420 (Cal. App.), review denied, 1989 Cal. LEXIS 5073 ______________ (Cal. 1989), cert. denied, 496 U.S. 936 (1990). See also _____________ ________ Quinn v. Southern Pacific Trans. Co., 711 P.2d 139, 144 (Or. ____________________________________ App. 1985) (because neither party argued that employee's physical handicap discrimination claim under Oregon law "implicate[d] any provision of a collective bargaining agreement," Oregon law was not preempted by the RLA), review ______ denied, 715 P.2d 93 (Or. 1986). ______ -12- arising out of the interpretation of collective-bargaining agreements." Union Pacific Ry., 439 U.S. at 94. The ___________________ procedures provided by the RLA were intended "to secure the prompt, orderly, and final settlement of grievances that arise daily between employees and carriers." Id. O'Brien has fully availed himself of such procedures. To permit him to relitigate the issue of his physical fitness by way of a claim under a state physical handicap discrimination law would clearly conflict with the "prompt, orderly, and final settlement of grievances" sought by Congress in enacting the RLA's dispute resolution procedures. Affirmed. ________ -13-