593 A.2d 750

EDWARD MAHER, PLAINTIFF–APPELLANT AND CROSS–RE-
SPONDENT, v. NEW JERSEY TRANSIT RAIL OPERATIONS,
INC., DEFENDANT–RESPONDENT AND CROSS–APPELLANT,
AND BROTHERHOOD OF RAILROAD SIGNALMEN, DEFEN-
DANT–RESPONDENT.

Argued February 11, 1991—Decided August 1, 1991.

. *Sanford R. Oxfeld* argued the cause for appellant and cross-respondent (*Balk, Oxfeld, Mandell & Cohen,* attorneys).

*Andrea M. Silkowitz,* Assistant Attorney General, argued the cause for respondent and cross-appellant (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Harrier Heuer Miller,* Deputy Attorney General, on the brief).

*Timothy R. Hott* argued the cause for respondent (*Hott & Margolis,* attorneys).

*Richard E. Shapiro,* Director, Division of Public Interest Advocacy, argued the cause for *amicus curiae,* Public Advocate (*Wilfredo Caraballo,* Public Advocate, attorney; *Richard E. Shapiro* and *Kevin H. Marino,* Director of Litigation, on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

This appeal presents questions of federal preemption, under provisions of the Railway Labor Act, 45 *U.S.C.A.* §§ 151 to 188, and the Federal Railroad Safety Act, 45 *U.S.C.A.* §§ 421 to 444, of state-law-based claims involving employees' rights.

Plaintiff, Edward Maher, dismissed from his employment with defendant New Jersey Transit Rail Operations, Inc. (NJT), filed suit against the employer alleging violations of the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 to –42 (LAD), and the New Jersey Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8 (Whistleblower Act or CEPA). His complaint also named his union, charging it with a breach of its duty of fair representation. The trial court dismissed the complaint on defendants' motions for summary judgment, ruling that all of plaintiff's claims were preempted by the Railway Labor Act. The Appellate Division affirmed so much of that ruling as dismissed the LAD and fair-representation claims, but reinstated plaintiff's claim under the Whistleblower Act. See 239 *N.J.Super.* 213, 570 *A.*2d 1289 (1990).

We granted plaintiff's petition for certification and NJT's cross-petition. See 122 *N.J.* 182, 584 *A.*2d 243 (1990). We now affirm the Appellate Division judgment restoring plaintiff's CEPA claim and holding the LAD claim preempted, but reverse so much of its judgment as determines that plaintiff's claim against the union is preempted by the Railway Labor Act.

I

Plaintiff began working as a signalman for NJT on January 1, 1983, the date it took over certain of the commuter-rail operations of Conrail, for whom plaintiff had worked since 1976. Maher was a member of defendant Brotherhood of Railroad Signalmen (BRS), the exclusive representative under a collective-bargaining agreement for NJT employees who work in plaintiff's field.

In 1984 Maher was diagnosed as being legally blind in his right eye as a result of a pellet-gun accident that had occurred in 1969. Although the injury caused the loss of central vision in that eye, plaintiff's peripheral vision was unaffected. Shortly after the diagnosis Maher's supervisor, William French, attempted to require Maher to wear safety glasses pursuant to

NJT's Maintenance of Way Department Safety Rule 15, which directs that "[a]n employee blind or practically blind in the eye must wear protective glasses at all times while on company property." Maher complained, however, that the glasses' side shields prevented him from seeing out of his right eye at all. Following recommendations from Maher's personal physician and an NJT doctor, NJT agreed, at first, to exempt Maher from Rule 15's application.

Maher and French apparently did not enjoy an amicable relationship. For several days in June 1984 Maher retained a private investigator to monitor French's working-hour activities. The investigator reported that French had authorized unearned overtime pay for friends, had drunk and played golf while on duty, had arranged for certain of those in his charge to work on his home while being paid by NJT, and had otherwise abused his position. Maher had the investigator submit his report to NJT's police department, which conducted its own inquiry. As a result of evidence gleaned from its own investigation and from Maher's report, NJT dismissed French.

Maher took a leave of absence from his job from March 1985 until March 1986, claiming that he needed the time off to recover from stress related to harassment at NJT over his sight handicap. Three months after his return, while Maher was on the job, his eyes were exposed to weed-poison spray, resulting in chemical conjunctivitis, which caused plaintiff to leave work for several weeks. He returned in July 1986, with a note from his doctor requesting light duty because of continuing sensitivity in his eyes. NJT did not offer that duty, however, and plaintiff did not resume work at that time.

That September Maher sought to return to his job as a signalman but was informed that he would be required to wear safety glasses at all times in accordance with Rule 15. Because plaintiff refused to work under that condition, NJT did not permit him to resume his former position. Pursuant to the collective-bargaining agreement, plaintiff filed a grievance in

January 1987, claiming that NJT had refused unjustifiably to allow him to return to work.

Maher stayed out of work while BRS negotiated his grievance with NJT. The union, however, neglected to include plaintiff in the discussions or to determine whether he found the proposed solutions acceptable. Plaintiff rejected an initial settlement that had been achieved by the employer and the union that would have resulted in Maher's transfer to a "cable gang," so BRS and the carrier resumed negotiations. A second agreement between the union and NJT was struck in September 1987; it called for Maher to receive no back pay for the year that spanned the railway's refusal to allow him to return to work as a signalman because of his unwillingness to wear glasses and the date of the settlement, and for Maher to be transferred to a midnight-shift clerical position and to wear protective goggles at that desk job. The settlement, made pursuant to a provision of the collective-bargaining agreement that governed the transfer of disabled employees, included a proviso that plaintiff report back to work within ten days of notification of its terms.

Maher rejected that settlement as well, asserting that he was ill-suited for the proposed job because of lack of training and that safety goggles at a desk job were superfluous. Despite Maher's request that NJT resolve the matter directly with his personal attorney, the employer refused to do so, asserting that the union was plaintiff's duly-authorized representative. When Maher persisted in his refusal, without "proper justification," to report to work at the position designated in the settlement agreement, NJT, pursuant to the collective-bargaining agreement, conducted a dismissal hearing. Plaintiff represented himself at the hearing, although the union was present. In spite of Maher's testimony that he had never been consulted about the settlement, that he was unsuited for the new job, and that by previous agreement he was exempted from Rule 15, NJT dismissed him for insubordination in December 1987.

Plaintiff filed his complaint in the Law Division one month later. In the meantime, and over plaintiff's objection, the union unsuccessfully pursued an appeal of Maher's dismissal with NJT. The union then obtained an arbitration hearing before the Special Board of Adjustment (Adjustment Board), an informal, quasi-judicial forum established by the Railway Labor Act to hear grievances not settled by union/carrier conference. See 45 *U.S.C.A.* § 153 Second. The Adjustment Board found that NJT and the union had negotiated in good faith to seek a solution by which Maher could comply with Rule 15 and continue his employment. It then found that Maher's termination for insubordination had been warranted because he had not returned to work under the terms of the settlement agreement and that the dismissal hearing had included no procedural irregularities or due-process defects that would have affected Maher's right to a fair hearing. The Adjustment Board concluded that Maher could not unilaterally disqualify himself from the clerical assignment, that his refusal to report for the position constituted an inappropriate job action, and that NJT had been justified in dismissing him.

The Law Division granted summary judgment for defendants on all counts of the complaint, ruling that plaintiff's three claims were preempted by the Railway Labor Act. As indicated, the Appellate Division affirmed the dismissal of the LAD and fair-representation claims and reversed on the Whistleblower Act claim.

## II

We begin with a brief outline of the elementary premises supporting the preemption doctrine. Under our federal system of government the States possess sovereignty concurrent with that of the federal government, subject only to the limitations imposed by the supremacy clause of the United States Constitution, article VI, clause 2. *Tafflin v. Levitt,* 493 *U.S.* 455, ——, 110 *S.Ct.* 792, 795, 107 *L.Ed.*2d 887, 894 (1990). That clause

provides that laws made in pursuance of federal constitutional authority become the "supreme law of the land." Although a State has the power, inherent in any sovereign, to determine what shall be an offense against its authority, "state laws that 'interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution' are invalid." *Wisconsin Pub. Intervenor v. Mortier,* —— *U.S.* ——, ——, 111 *S.Ct.* 2476, 2478, 115 *L.Ed.*2d 532 (1991) (quoting *Gibbons v. Ogden,* 22 *U.S.* 1, 71, 6 *L.Ed.* 23, 73 (9 Wheat.) (1824)). "The constitutional principles of pre-emption, in whatever particular field of law they operate, are designed with a common end in view: to avoid conflicting regulation of conduct by various official bodies [that] might have some authority over the subject matter." *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge,* 403 *U.S.* 274, 285–86, 91 *S.Ct.* 1909, 1917–18, 29 *L.Ed.*2d 473, 482 (1971).

■ Whether a state law establishing a cause of action is preempted in a given case is a question of congressional intent. *Allis–Chalmers Corp. v. Lueck,* 471 *U.S.* 202, 208, 105 *S.Ct.* 1904, 1909, 85 *L.Ed.*2d 206 (1985). That intent may be obvious when it is expressly set forth by Congress in the terms of its statute. *See Dewey v. R.J. Reynolds Tobacco Co.,* 121 *N.J.* 69, 77, 577 *A.*2d 1239 (1990). In the absence of explicit statutory language, congressional intent to supersede state law in a given area is implicit if the scheme of federal regulation is

"so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," if "the Act of Congress * * * touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or if the goals "sought to be obtained" and the "obligations imposed" reveal a purpose to preclude state authority. [*Mortier, supra,* —— *U.S.* at ——, 111 *S.Ct.* at 2478 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 *U.S.* 218, 230, 67 *S.Ct.* 1146, 1152, 91 *L.Ed.* 1447, 1459 (1947)).]

■ Finally, even in the absence of express language or implied congressional intent to occupy the field, a court must find state law to be preempted "to the extent that it actually conflicts with federal law." *Brown v. Hotel Employees Int'l*

*Union,* 468 *U.S.* 491, 510, 104 *S.Ct.* 3179, 3190, 82 *L.Ed.*2d 373, 383 (1984). Such conflict is found when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 *U.S.* 132, 142–43, 83 *S.Ct.* 1210, 1217–18, 10 *L.Ed.*2d 248, 257 (1963), or if the local law impedes the accomplishment of the full purposes and objectives of Congress acting pursuant to its constitutional powers. *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 *U.S.* 311, 316, 101 *S.Ct.* 1124, 1129, 67 *L.Ed.*2d 258, 265 (1981). The relative importance to the State of its own law is not material when that law conflicts with a valid federal statute. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 *U.S.* 141, 153, 102 *S.Ct.* 3014, 3022, 73 *L.Ed.*2d 664, 675 (1982).

◼ The doctrine of preemption in labor law concerns the extent to which Congress has limited the permissible scope of state regulation of activity touching on labor/management relations. *New York Tel. Co. v. New York State Dep't of Labor,* 440 *U.S.* 519, 527, 99 *S.Ct.* 1328, 1334, 59 *L.Ed.*2d 553, 561 (1979). Although congressional preemptive power in the field of labor relations is well established, see *National Labor Relations Board v. Jones & Laughlin Steel Corp.,* 301 *U.S.* 1, 57 *S.Ct.* 615, 81 *L.Ed.* 893 (1937), the federal legislative body "has never exercised authority to occupy the entire field in the area of labor legislation." *Lueck, supra,* 471 *U.S.* at 208, 105 *S.Ct.* at 1909, 85 *L.Ed.*2d at 213. The Supreme Court has indicated that it " 'cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States.' " *Id.* at 208 n. 4, 105 *S.Ct.* at 1909 n. 4, 85 *L.Ed.*2d at 213 n. 4 (quoting *Lockridge, supra,* 403 *U.S.* at 289, 91 *S.Ct.* at 1919, 29 *L.Ed.*2d at 484). Thus, the question of whether a state statute addressing labor and management relations is preempted by federal considerations is one of congressional intent; " '[t]he purpose of Congress is the ultimate touchstone.' " *Id.* at 208, 105 *S.Ct.* at 1909, 85

*L.Ed.*2d at 213 (quoting *Malone v. White Motor Corp.*, 435 *U.S.* 497, 504, 98 *S.Ct.* 1185, 1190, 55 *L.Ed.*2d 443, 450 (1978)).

Preemption of state law affecting the railroad industry is governed by the Railway Labor Act. That statute, "and the concepts that are a part of it, 'cannot be appreciated apart from the environment out of which it came and the purposes which it was designed to serve.'" *Southeastern Pa. Transp. Auth. v. Brotherhood of Ry. Signalmen*, 882 *F.*2d 778, 782 (3d Cir.1989) (quoting *Elgin, J. & E. Ry. v. Burley*, 325 *U.S.* 711, 751, 65 *S.Ct.* 1282, 1303, 89 *L.Ed.* 1886, 1909 (1945) (Frankfurter, J., dissenting)), *cert. denied,* —— *U.S.* ——, 110 *S.Ct.* 840, 107 *L.Ed.*2d 835 (1990).

When war broke out in Europe in 1914, the demand in this country for munitions and other supplies depleted the pool of available labor and increased greatly the volume of railroad freight traffic. Railroad labor, finding itself in a strong bargaining position, sought substantial concessions from the nation's railroad managers. When the railroads rebuffed those demands, the four major unions voted overwhelmingly for a nationwide strike. See generally J. Stover, *The Life and Decline of the American Railroad* 118–21, 159 (1970). In order to ensure efficient, uninterrupted rail service during this country's involvement in the war, the federal government temporarily nationalized the industry in 1917. The government gave full recognition to the unions, which resulted in rapid growth in worker membership. See Garrison, *The National Railroad Adjustment Board: A Unique Administrative Agency*, 46 *Yale L.J.* 567, 570 (1937). Government-and-union cooperation produced nationwide rules establishing seniority rights, reasonable working hours, security from arbitrary discharge, and a more equitable pay scale. *Ibid.* Recognizing that the railway industry is a "state within a state," with its own customs and vocabulary, the government instituted bi-partisan adjustment boards to apply and interpret those rules when disputes arose. Those boards enjoyed a remarkable record of resolving disputes. *Ibid.*

Although the federal government considered retaining control of the railroads after the war's conclusion, it returned the industry to private hands in 1920. Despite an atmosphere charged with labor unrest, management successfully acted to curb war-time employment and wage peaks, and many of the gains achieved by the unions were lost within a few years. The competent war-time adjustment boards were replaced with another form of review panel notable chiefly for its ineffectiveness, and the concept of a board with nation-wide reach eventually lost support from both labor and management. *Id.* at 571–73.

When Congress adopted the initial version of the Railway Labor Act in 1926, it concentrated on affirming the equal authority of carrier and union in negotiating a collective-bargaining agreement. The 1926 Act provided a localized dispute-review system that left the parties free at all times to go to court to resolve even the smallest disputes over the terms of those agreements. See *Burley, supra,* 325 *U.S.* at 725–26, 65 *S.Ct.* at 1290–91, 89 *L.Ed.* at 1896. The parties' extravagant resort to the courtroom that followed the 1926 Act resulted in constant deadlock that crippled the system. Individual grievances accumulated unresolved until their sheer volume took on the proportions of a major dispute. *Id.* at 726, 65 *S.Ct.* at 1291, 89 *L.Ed.* at 1896. When a national crisis appeared imminent, with several unions taking strike ballots, Congress strove to break the impasse with its 1934 amendments to the Act.

Recognizing that the mounting unrest had been fostered by the inability of the optional-jurisdiction boards to resolve small-scale differences conclusively, Congress sought to ensure stability by "providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements." *Union Pac. R.R. v. Sheehan,* 439 *U.S.* 89, 94, 99 *S.Ct.* 399, 402, 58 *L.Ed.*2d 354, 359 (1978). Prominent among the changes was the creation of a compulsory and binding arbitral system made up of a National Railroad Adjustment Board, see 45 *U.S.C.A.* § 153

First, and adjustment boards established for a system, group, or region, or by a carrier and its unions, see *id.* § 153 Second. Under that scheme "disputes * * * growing out of grievances" are to be resolved in the first instance by the parties. *Id.* § 153 First (i). If that effort is unsuccessful, the Railway Labor Act provides that the dispute be referred to an Adjustment Board (as we shall refer to any Railway Labor Act adjustment board) for resolution. See *ibid.; id.* § 153 Second. Decisions of an Adjustment Board are final and binding. See *id.* § 153 First (m).

The Adjustment Boards are charged with securing the "prompt, orderly and final settlement of grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions." *Sheehan, supra,* 439 *U.S.* at 94, 99 *S.Ct.* at 402, 58 *L.Ed.*2d at 359. Although not so labelled by the Act, such disputes have been termed "minor" by the United States Supreme Court. See *Burley, supra,* 325 *U.S.* at 723, 65 *S.Ct.* at 1289, 89 *L.Ed.* at 1894. ("Major" disputes, on the other hand, relate to differences "over the formation of collective agreements or efforts to secure them"; they "present the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the [Railway Labor] Act sought to avoid." *Id.* at 723–24, 65 *S.Ct.* at 1289–90, 89 *L.Ed.* at 1894–95.) In order to ensure the effectiveness of the revised Railway Labor Act, Congress considered it "essential" that minor disputes be kept within the jurisdiction of the Adjustment Boards "and out of the courts." *Sheehan, supra,* 439 *U.S.* at 94, 99 *S.Ct.* at 402, 58 *L.Ed.*2d at 359. Although the Act provides that appeals from decisions of the Adjustment Boards may be taken in the federal courts, 45 *U.S.C.A.* § 153 First (q), that review has been characterized as "among the narrowest known to the law." *Id.* at 91, 99 *S.Ct.* at 401, 58 *L.Ed.*2d at 357.

Even so, the courts have recognized four exceptions to the general rule that carriers, unions, and employees are limited to the forum of the Adjustment Boards for the resolution of

grievances. Because an important policy underlying the Railway Labor Act's scheme is to afford employees means for redress, judicial intervention is warranted when "it appears that without such access to the courts the employee's right to redress would be jeopardized." *Childs v. Pennsylvania Fed'n Bhd. of Maintenance Way Employees,* 831 *F.*2d 429, 437 (3d Cir.1987). Thus, the employee may sue the employer in federal court "(1) when the employer repudiates the private grievance machinery; (2) when resort to administrative remedies would be futile; * * * (3) when the employer is joined in a DFR [duty-of-fair-representation] claim against the union," or (4) "when, because of breach of the DFR by the union, an employee loses the right to press his grievance before the Board." *Ibid.*

In arguing that his claims are not preempted by federal law, plaintiff urges this Court to look to the causes of action pleaded in his complaint. He contends that because his claims are purportedly based on state-established rights and not on the collective-bargaining agreement, those claims should survive Railway Labor Act preemption. NJT counters that plaintiff's claims constitute nothing more than an artfully-crafted minor dispute, subject to the exclusive jurisdiction of the Adjustment Board.

We examine the effect of preemption on each of Maher's counts in turn.

### III

### –A–

We agree with the Appellate Division's ruling that Maher's allegation that NJT violated New Jersey's Whistleblower Act survives a preemption challenge. See 239 *N.J.Super.* at 227–28, 570 *A.*2d 1289. We are satisfied that Maher's CEPA-based claim is not an "artfully-crafted minor dispute" subject to the preemptive effect of the Railway Labor Act.

NJT, relying on *Consolidated Rail Corp. v. Railway Labor Executives' Association,* 491 *U.S.* 299, 307, 109 *S.Ct.* 2477, 2482–83, 105 *L.Ed.*2d 250, 264 (1989), contends that a disagreement over an employer's action is a minor dispute if the contested action is "arguably justified" by the terms of the parties' collective-bargaining agreement. We do not consider that case to be controlling because the Court adopted that standard in order to determine whether a disagreement is a major dispute, for which the strike option is available, rather than a minor dispute and therefore subject to the exclusive arbitral power of the Adjustment Boards. The danger with indiscriminate use of the "arguably justified" standard in distinguishing between minor disputes and complaints that do not implicate the Railway Labor Act is that it enables a railway "simply [to] hide behind the arbitration provisions of a collective bargaining agreement to bypass [its] employees' statutory right[s]." *McCall v. Chesapeake & O. Ry.,* 844 *F.*2d 294, 300 (6th Cir.), *cert. denied,* 488 *U.S.* 879, 109 *S.Ct.* 196, 102 *L.Ed.*2d 166 (1988). Nevertheless, we consider the "arguably justified" test useful for resolving whether Maher's CEPA-based claim comes within the exclusive purview of the Adjustment Boards. See, *e.g., Southeastern Pennsylvania Transportation Authority, supra,* 882 *F.*2d at 783–84.

█ The standard is expressed as follows:
"If the disputed action of one of the parties can 'arguably' be justified by the existing agreement or, in somewhat different statement, if the contention that the labor contract sanctions the disputed action is not 'obviously insubstantial,' the controversy is a [minor dispute] within the exclusive province of the National Railroad Adjustment Board." [*Consolidated Rail Corp., supra,* 491 *U.S.* at 306, 109 *S.Ct.* at 2482, 105 *L.Ed.*2d at 263 (quoting *Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 845 *F.*2d 1187, 1190 (3d Cir.1988)).]

The key to this puzzle lies in the nature of the "disputed action." Keeping in mind that the question arises in the context of NJT's motion for summary judgment, we accept as true Maher's contention that he was fired in retaliation for having reported French's abuses of position. The nub of the disputed action, then, is not that Maher was discharged, which

"arguably" would be covered by the "just-cause" provision of the collective-bargaining agreement, but that he was discharged in retaliation for having reported violations of the law. The pertinent question is whether the collective-bargaining agreement addresses NJT's alleged conduct.

Although NJT's burden is "relatively light" in showing that the agreement brings Maher's claim within the exclusive jurisdiction of the Adjustment Boards, *see Consolidated Rail Corp., supra,* 491 *U.S.* at 307, 109 *S.Ct.* at 2483, 105 *L.Ed.*2d at 264, the employer has not met that minimal standard. NJT has not suggested (the suggestion would be "obviously insubstantial") that a retaliatory discharge is "sanctioned" or "justified" by a provision in the agreement. It can point to no part of the collective-bargaining agreement that demonstrates that the carrier and the union have agreed on standards relevant to Maher's situation. Maher's claim of retaliatory discharge does not in any way turn on an interpretation of the just-cause-discharge clause or any other clause in the agreement.

We find in the Railway Labor Act no express congressional limitation of the right of States to protect an employee from discharge in retaliation for reporting violations of law, nor can such limitation be inferred from the federal act's scope. We also conclude that the survival of Maher's CEPA-based claim does not frustrate the federal policy that railway-contract disputes be resolved exclusively by Adjustment Boards so that a contract term's meaning be given a uniform federal interpretation. Because Maher does not assert his claim in reliance on rights established in the collective-bargaining agreement, and because resolution of that claim does not depend on an interpretation of the terms of that agreement, the claim is not one of the collective-bargaining-agreement-based court forays that Congress intended the Railway Labor Act to preempt.

The area of the law discussed under this point has been settled in this state since *LePore v. National Tool & Manufacturing Co.,* 224 *N.J.Super.* 463, 540 *A.*2d 1296 (App.Div.1988),

*aff'd o.b.,* 115 *N.J.* 226, 557 *A.*2d 1371, *cert. denied,* — *U.S.* ——, 110 *S.Ct.* 366, 107 *L.Ed.*2d 353 (1989), a decision that presaged the Supreme Court's ruling in *Lingle v. Norge Division of Magic Chef,* 486 *U.S.* 399, 408–11, 108 *S.Ct.* 1877, 1883–84, 100 *L.Ed.*2d 410, 420–21 (1988). In *LePore,* the Appellate Division outlined the premises of a common-law retaliatory-discharge claim, noting that "the trial would simply consist of plaintiff's establishing that he was in fact fired for [reporting a violation of the law] and [the employer] would then have to demonstrate he was fired for another, non-pretextual reason." 224 *N.J.Super.* at 473, 540 *A.*2d 1296. Those burdens are no different now that the cause of action has been codified. *See Parker v. M & T Chems., Inc.,* 236 *N.J.Super.* 451, 460, 566 *A.*2d 215 (App.Div.1989); *N.J.S.A.* 34:19–3. *Lingle* emphasizes that each of those

> purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer. Neither of the [demonstrations] requires a court to interpret any term of a collective-bargaining agreement. * * * Thus, the state-law remedy in this case is "independent" of the collective-bargaining agreement in the sense that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement. [486 *U.S.* at 407, 108 *S.Ct.* at 1882, 100 *L.Ed.*2d at 419–20.]

Because that inquiry is so fact-sensitive, we reject NJT's invitation to rule on whether Maher has pleaded a cognizable CEPA claim. We hold only that Maher's claim withstands summary judgment on the minor-dispute issue, and do not decide whether he has asserted facts sufficient to prove the essential elements of a CEPA cause of action.

We disagree with NJT's disparagement of the value of *LePore* and *Lingle* because the cases addressed the extent of the preemption doctrine under section 301 of the Labor Management Relations Act, see 29 *U.S.C.A.* § 185, a statute purportedly with "less preemptive force" than the Railway Labor Act. When a collective-bargaining agreement subject to the Labor Management Relations Act establishes a grievance and arbitration remedy, that remedy preempts state-law-based claims by

force of section 301. *See Republic Steel Corp. v. Maddox,* 379 *U.S.* 650, 652–53, 85 *S.Ct.* 614, 616, 13 *L.Ed.*2d 580, 583–84 (1965). That preemptive effect is no different from that granted to the arbitral remedies established by the Railway Labor Act. Preemption becomes a dominant consideration under both statutes when the arbitration process can be disrupted or when the uniformity of national law is threatened by a state claim that must be vindicated through outside interpretation of a collective-bargaining agreement. *See ibid.; Lueck, supra,* 471 *U.S.* at 210–13, 105 *S.Ct.* at 1910–12, 85 *L.Ed.*2d at 215–17; *Andrews v. Louisville & N.R.R.,* 406 *U.S.* 320, 324, 92 *S.Ct.* 1562, 1565, 32 *L.Ed.*2d 95, 99 (1972).

The Supreme Court, however, has rejected the argument that the Railway Labor Act provides the exclusive forum for *any* dispute arising out of railroad-workplace conditions. *See Atchison, T. & S. Fe Ry. v. Buell,* 480 *U.S.* 557, 563–64, 107 *S.Ct.* 1410, 1414, 94 *L.Ed.*2d 563, 572 (1987). The Railway Labor Act does not concern itself with every conceivable issue that arises in the employment setting; at the heart of the disputes described in section 151 is the collective-bargaining agreement. *Sabich v. National R.R. Passenger Corp.,* 763 *F.Supp.* 989, 992 (N.D.Ill.1991). In circumstances such as this, when the collective-bargaining agreement does not address the disputed action, the Railway Labor Act cannot have more preemptive force than section 301. *See, e.g., Lancaster v. Norfolk & W. Ry.,* 773 *F.*2d 807, 816–17 (7th Cir.1985), *cert. denied,* 480 *U.S.* 945, 107 *S.Ct.* 1602, 94 *L.Ed.*2d 788 (1987).

The preemption doctrine does not deny a State its traditional police powers over employment-related disputes simply because a collective-bargaining agreement includes a mechanism for grievance arbitration. *See, e.g., Lingle, supra,* 486 *U.S.* at 411–13, 108 *S.Ct.* at 1884–85, 100 *L.Ed.*2d at 422–23; *cf. Buell, supra,* 480 *U.S.* at 564–65, 107 *S.Ct.* at 1415, 94 *L.Ed.*2d at 572–73 (despite strong policy in favor of arbitration, the mere availability of arbitration does not mandate Railway Labor Act preemption of employee's federal statutory claim that is inde-

pendent of employer's obligations under its collective-bargaining agreement). The arbitral forum must be authorized and competent to resolve the dispute brought before it. "[A]rbitration is a continuation of the collective-bargaining process," *LePore, supra,* 224 *N.J.Super.* at 471, 540 *A.*2d 1296, and the role of the arbitrator is to interpret the labor contract and to apply the agreement to the facts of a dispute. On the other hand, the arbitrator "ordinarily cannot consider public interest, and does not determine violations of law or public policy." *Id.* at 472, 540 *A.*2d 1296. When, as here, the agreement does not address the circumstances of the challenged action, and the employee's claim relies solely on the laws of our state, an Adjustment Board is not the proper forum for resolution of the dispute.

Our decision does not contradict the rule of *Andrews v. Louisville & Nashville Railroad, supra,* 406 *U.S.* 320, 92 *S.Ct.* 1562, 32 *L.Ed.*2d 95, which established the exclusive jurisdiction of the Adjustment Boards over minor disputes. There all parties conceded that

> the only source of petitioner's [ (the employee's) ] right not to be discharged, and therefore to treat an alleged discharge as a "wrongful" one that entitles him to [state-law-based breach-of-contract] damages, is the collective-bargaining agreement * * *. Respondent [ (the employer) ] in this case vigorously disputes any intent on its part to discharge petitioner, and the pleadings indicate that the disagreement turns on the extent of respondent's obligation to restore petitioner to his regular duties following injury * * *. The existence and extent of such an obligation in a case such as this will depend on the interpretation of the collective-bargaining agreement. Thus petitioner's claim, and respondent's disallowance of it, stem from differing interpretations of the collective-bargaining agreement. * * * His claim is therefore subject to the [Railway Labor] Act's requirement that it be submitted to the Board for adjustment. [*Id.* at 324, 92 *S.Ct.* at 1565, 32 *L.Ed.*2d at 99.]

That dispute centered on the provisions of the collective-bargaining agreement, a feature not present here.

NJT cites several cases, including *Jackson v. Consolidated Rail Corp.,* 717 *F.*2d 1045 (7th Cir.1983), *cert. denied,* 465 *U.S.* 1007, 104 *S.Ct.* 1000, 79 *L.Ed.*2d 233 (1984), that hold that evaluation of a retaliatory-discharge complaint (following the

filing of a claim under the Federal Employer's Liability Act, 45 *U.S.C.A.* §§ 51–60) does indeed depend on an interpretation of the collective-bargaining agreement. We note that those cases were decided before the *Lingle* decision, in which the Supreme Court rejected that type of rationale. See 486 *U.S.* at 407–09, 108 *S.Ct.* at 1882–83, 100 *L.Ed.*2d at 419–21. Other cases cited by NJT in which courts have held as preempted a plaintiff's state-law-based tort claims are readily distinguishable because they were either artfully-drawn minor disputes, see, *e.g., de la Rosa Sanchez v. Eastern Airlines,* 574 *F.*2d 29 (1st Cir.1978) (dispute over pension payments), and *Arbogast v. CSX Corp.,* 655 *F.Supp.* 371 (N.D.W.Va.1987) (dispute over vacation pay), *aff'd,* 831 *F.*2d 290 (4th Cir.1987), or did not involve a claim of retaliatory discharge.

We also agree with the Appellate Division's ruling, see 239 *N.J.Super.* at 227–28, 570 *A.*2d 1289, that Maher's claim does not implicate the Federal Railroad Safety Act, a statute in which Congress has clearly delineated the extent of its intent to preempt local law. That statute expressly sets forth Congress's desire that "laws, rules, regulations, orders and standards relating to *railroad safety* shall be nationally uniform to the extent practicable." 45 *U.S.C.A.* § 434 (emphasis added). As noted below, Maher's allegation of retaliatory discharge does not relate to reporting safety-code violations but to cheating and fraud.

–B–

We next determine whether Congress intended that the Railway Labor Act supersede the availability of a state court forum for Maher's claim that his union breached its duty of fair representation. We conclude that Congress did not so intend, and reverse so much of the Appellate Division judgment as holds otherwise. See 239 *N.J.Super.* at 228–29, 570 *A.*2d 1289.

The Supreme Court first established a union's duty of fair representation toward its members in an action under the

Railway Labor Act. See *Steele v. Louisville & Nashville Railroad,* 323 *U.S.* 192, 65 *S.Ct.* 226, 89 *L.Ed.* 173 (1944). The Court reasoned there that because a union acts as the exclusive bargaining agent of a craft or class of railway employees by authority of the Railway Labor Act, see 45 *U.S.C.A.* § 152 Fourth, the Act implicitly imposes on the union the duty to bargain fairly on behalf of all its members. 323 *U.S.* at 202–03, 65 *S.Ct.* at 232, 89 *L.Ed.* at 183. A member's complaint that the union breached its duty of fair representation is not a minor dispute subject to the jurisdiction of the Adjustment Boards because such a complaint is not a "dispute[ ] between an employee or group of employees and a carrier" and does not involve "differences as to the interpretation of the [collective-bargaining agreement]." *Id.* at 205, 65 *S.Ct.* at 233, 89 *L.Ed.* at 185. What the plaintiff-member in *Steele* alleged was the union's violation of a federal statutory right, not a breach of the collective-bargaining agreement. *Id.* at 204–05, 65 *S.Ct.* at 233, 89 *L.Ed.* at 184. The Court concluded that because the Railway Labor Act provides no adequate administrative means for resolving disputes between employees and their own union, no exhaustion of administrative remedies was required and the member could bring an action alleging breach of duty directly in the courts. *Id.* at 205–07, 65 *S.Ct.* at 233–34, 89 *L.Ed.* at 185–86; *Glover v. St. Louis—S.F. Ry.,* 393 *U.S.* 324, 329–30, 89 *S.Ct.* 548, 551, 21 *L.Ed.*2d 519, 523–24 (1969).

The Court's logic in *Steele,* which was applied to a union that had breached its duty while negotiating the terms of a collective-bargaining agreement, was extended to discriminatory enforcement of a contract that is "fair and impartial on its face" in *Conley v. Gibson,* 355 *U.S.* 41, 46, 78 *S.Ct.* 99, 102, 2 *L.Ed.*2d 80, 85 (1957). "The duty requires a union 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,* 494 *U.S.* 558, ——, 110 *S.Ct.* 1339, 1344, 108 *L.Ed.*2d 519, 527 (1990) (quoting *Vaca v. Sipes,*

386 *U.S.* 171, 177, 87 *S.Ct.* 903, 910, 17 *L.Ed.*2d 842, 850 (1967)). The Court has explained that its "refusal to limit judicial competence to rectify a breach of the duty of fair representation rests upon [its] judgment that such actions cannot, in the vast majority of situations where they occur, give rise to actual conflict with the operative realities of federal labor policy." *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees v. Lockridge, supra,* 403 *U.S.* at 301, 91 *S.Ct.* at 1925, 29 *L.Ed.*2d at 491.

BRS concedes that state courts share concurrent jurisdiction with federal courts over fair-representation claims. See, *e.g., Vaca v. Sipes, supra,* 386 *U.S.* at 188, 87 *S.Ct.* at 916, 17 *L.Ed.*2d at 856–57. When hearing such claims, the court is acting on a federal statutory right (in this case inferred from the Railway Labor Act) and must apply federal law. *See Steele, supra,* 323 *U.S.* at 204, 65 *S.Ct.* at 233, 89 *L.Ed.* at 184.

The trial court's dismissal of Maher's fair-representation claim was solely on the basis of its erroneous conclusion that the matter constituted a minor dispute; that court made no evaluation of the merits of the allegation. The Appellate Division, on the other hand, after affirming the trial court's minor-dispute ruling, went on to consider and dismiss the merits of plaintiff's claim. See 239 *N.J.Super.* at 228–29, 570 *A.*2d 1289. Without expressing any view on the ultimate merits of plaintiff's claim, we add some cautionary observations.

The summary-judgment procedure is designed to determine quickly and inexpensively whether a claim presents any genuine issue of material fact requiring disposition at a trial. *Judson v. Peoples Bank & Trust Co.,* 17 *N.J.* 67, 74, 110 *A.*2d 24 (1954). When considering a motion for summary judgment, the court is to act "indulgently" in drawing in favor of the opposing party all reasonable inferences. *Id.* at 75, 110 *A.*2d 24. Of course, if that party offers "fanciful, frivolous, gauzy or merely suspicious" allegations of fact in support of the

claim, the court is justified in granting summary judgment. *Ibid.*

We would not abandon plaintiff's claim as readily as did the Appellate Division. " '[W]here the courts are called upon to fulfill their role as the primary guardians of the duty of fair representation,' complaints should be construed to avoid dismissals * * *." *Czosek v. O'Mara,* 397 *U.S.* 25, 27, 90 *S.Ct.* 770, 772, 25 *L.Ed.*2d 21, 24 (1970) (quoting *O'Mara v. Erie L.R.R.,* 407 *F.*2d 674, 679 (2d Cir.1969)). To establish a breach of duty, Maher must show that his union's conduct toward him was " 'arbitrary, discriminatory, or in bad faith.' " *Zalejko v. Radio Corp. of Am.,* 98 *N.J.Super.* 76, 83, 236 *A.*2d 160 (App.Div. 1967) (quoting *Vaca v. Sipes, supra,* 386 *U.S.* at 190, 87 *S.Ct.* at 916, 17 *L.Ed.*2d at 857), *certif. denied,* 51 *N.J.* 397, 241 *A.*2d 14 (1968). The burden is not light; to prove discrimination, for example, a plaintiff must "adduce substantial evidence of [bias] that is intentional, severe, and unrelated to legitimate union objectives." *Lockridge, supra,* 403 *U.S.* at 301, 91 *S.Ct.* at 1925, 29 *L.Ed.*2d at 491. The court must be careful to distinguish "between honest, mistaken conduct * * * and deliberate and severely hostile and irrational treatment." *Ibid.*

With that in mind, we note that BRS settled Maher's dispute with NJT despite plaintiff's vigorous objections to the terms. Although a labor union has some discretion in determining the proper resolution of a member's grievance, *Vaca v. Sipes, supra,* 386 *U.S.* at 191–93, 87 *S.Ct.* at 917–18, 17 *L.Ed.*2d at 858–59, a review of what Maher sought and what his union obtained for him illustrates less of a give-and-take between NJT and BRS and more of a complete abdication by the union. Maher, supported by the opinion of doctors and NJT's previous waiver of Rule 15's requirement, claimed that his exemption from wearing safety goggles should continue; BRS agreed that plaintiff would wear the glasses. Maher sought full back pay for the period he had been prevented from working because of his refusal to wear the glasses; the union waived his claim for

the pay. Maher wanted to return to work at his former position; his union committed him to working at a clerical position for which plaintiff had neither experience nor enthusiasm. Despite Maher's resistance to the safety-glasses requirement, BRS agreed that plaintiff would wear such eyegear at his new job *behind a desk.* Although we acknowledge that the railroad environment features working conditions unique in American industry, we are unimpressed with the explanation of an NJT official at Maher's dismissal hearing that "[i]n a case of a position in the office, it could be possible that a pencil could puncture the eye."

Although compromising on every demand does not, of itself, amount to bad-faith negotiating, plaintiff has presented evidence sufficient to merit a more careful evaluation of BRS's motion for summary judgment by the trial court on remand.

–C–

Our final disposition addresses Maher's argument that his claim that NJT violated the LAD is not preempted by the Railway Labor Act. We are in accord with the Appellate Division's ruling upholding summary judgment for defendant on the claim, see 239 *N.J.Super.* at 225–27, 570 *A.*2d 1289, because we find Maher's claim to be a "minor dispute" within the exclusive province of the Adjustment Boards. We reject the arguments of plaintiff and *amicus,* the Public Advocate, that the claim is not preempted because it is based on state statutory rights independent of the collective-bargaining agreement, because vindication of the claim would interfere with the scheme of compulsory arbitration of disputes over rules and working conditions established by Congress.

Maher's complaint alleges that his "harassment, suspension and subsequent discharge * * * by [NJT] concerning safety glasses" violated the LAD. That statute prohibits "any unlawful discrimination against any person because such person is or has been at any time handicapped or any unlawful employment practice against such person." See *N.J.S.A.* 10:5–4.1.

Apart from any consideration of the statute's protective scope, we rule that Maher's complaint is a minor dispute because plaintiff's challenge to every allegedly-discriminatory action of NJT concerns a provision of the collective-bargaining agreement. Although Rule 15 itself is not part of the collective-bargaining agreement, the agreement does provide that while on duty, employees must comply with all NJT safety rules. Maher's complaint that NJT harassed him by revoking his "exemption" from Rule 15 and by refusing to allow him to return to work without wearing the glasses after his bout with chemical conjunctivitis is a dispute over the application of a collective-bargaining agreement provision concerning "rules * * * or working conditions." 45 *U.S.C.A.* § 151a(4). Maher's disagreement with NJT's work-return condition was filed as a grievance pursuant to Rule 4–K–1(a) of the collective-bargaining agreement. A determination of the effect of an employee's disability on job performance is arbitrable under Rule 8–D–3 of the collective-bargaining agreement. A disagreement over whether an issue is arbitrable at all is to be resolved by the Adjustment Board by authority of Rule 4–K–1(h)(1). The settlement of Maher's claim by his union and NJT was reached under Rules 3–E–1(a) and (b), which provide for the re-assignment of disabled employees. Finally, the propriety of Maher's eventual discharge for failure to report to the new position is governed by the agreement's just-cause provision, which incorporates NJT's General Rule D prohibiting acts of insubordination.

Although Maher contends that adjudication of his claim would not require an interpretation of the collective-bargaining agreement, clearly it would. The elements of a *prima facie* case of discriminatory harassment, transfer, or discharge are that (1) the complainant was handicapped within the meaning of the law; (2) the complainant had been performing his or her work at a level that met the employer's legitimate expectations; (3) the complainant nevertheless had been required to labor under conditions that were unreasonably differ-

ent from those of other employees, had been transferred, or had been fired; and (in the case of discriminatory transfer or discharge) (4) the employer had sought another to perform the same work after complainant had been removed from the position. *See Jansen v. Food Circus Supermarkets*, 110 *N.J.* 363, 382, 541 *A.*2d 682 (1988). Once the complainant's case has been established, the employer must demonstrate either the reasonableness of the otherwise-discriminatory act or the presence of a non-discriminatory reason for the employee's treatment. *Ibid.* "In deciding whether the nature and extent of an employee's handicap reasonably precludes job performance, an employer may consider whether the handicapped person can do his or her work without posing a serious threat of injury to the health and safety of himself or herself * * *." *Id.* at 374, 541 *A.*2d 682.

We conclude that any evaluation of NJT's defense to Maher's LAD claims requires an evaluation of the terms of the collective-bargaining agreement. NJT's defense of the LAD claim does not hinge on consideration of "purely factual questions" as was the case in *Lingle*. See 486 *U.S.* at 407, 108 *S.Ct.* at 1882, 100 *L.Ed.*2d at 419. Maher alleges that NJT was "harassing" him by its about-face on Rule 15's safety-glasses requirement; NJT claims that it was justified in imposing that requirement, considering Maher's partial blindness and the weed-spray incident. Maher claims NJT suspended him because of his handicap; NJT responds it was justified because of Maher's refusal to comply with its safety requirements. Finally, Maher asserts that his firing was based on fallout over his handicap; NJT counters by noting that it achieved a settlement with Maher's union re-assigning Maher to a position in which his disability would not place him in danger. An evaluation of whether NJT's actions were reasonable would have to be based on consideration of the carrier's conduct in following provisions of the collective-bargaining agreement negotiated between it and the class of employees of which Maher was a member.

Plaintiff's argument that our ruling must be controlled by *Colorado Anti–Discrimination Commission v. Continental Air Lines*, 372 *U.S.* 714, 83 *S.Ct.* 1022, 10 *L.Ed.*2d 84 (1963), is misplaced. There the Supreme Court held that State laws prohibiting racial discrimination are not preempted by the Railway Labor Act because conduct of that sort "is not by any construction a subject for collective-bargaining and arbitration." *McCall v. Chesapeake & O. Ry., supra*, 844 *F.*2d at 302. Maher seeks to apply that logic to his claim, relying on *Muncy v. Norfolk & Western Railway*, 650 *F.Supp.* 641, 643 (S.D.W.Va.1986), particularly its assertion that "handicap discrimination is certainly analogous to * * * race discrimination insofar as it relates to the issue of preemption by the Railway Labor Act."

We reject that reasoning. The Legislature recognized a job-performance-related difference between the two forms of bias when it amended the LAD to include the handicapped by restricting the enactment's reach when "the nature and extent of the handicap reasonably precludes the performance of the specific employment." See *N.J.S.A.* 10:5–4.1. The Legislature has also declared:

> Nothing contained in this act * * * shall be construed * * * to prohibit the establishment and maintenance of bona fide occupational qualifications * * * nor to prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment * * *. [*N.J.S.A.* 10:5–2.1.]

Although both racial and handicap discrimination are despicable, a handicapped person's physical or mental limitations may affect his or her ability to function at work. A concession related to the job-performance ability of victims of racial discrimination, on the other hand, is inconceivable. For that reason, an evaluation of an employee's disability and its effect on job performance is a proper subject for arbitration. When, as here, the parties have made an employee's lack of fitness to perform the job arbitrable under Rule 8–D–3 of the collective-bargaining agreement, an action alleging discrimination based on physical handicap is preempted as a "minor dispute" because

it raises an issue determinable solely under procedures established by the Railway Labor Act. *See McCall, supra,* 844 *F.*2d at 302–03; *Evans v. Southern Pac. Transp. Co.,* 213 *Cal. App.*3d 1378, 1386, 262 *Cal.Rptr.* 416, 420 (1989), *cert. denied,* — *U.S.* ——, 110 *S.Ct.* 3213, 110 *L.Ed.*2d 661 (1990).

Finally, plaintiff claims that because there is available a state statute addressing his complaint, he has the right to choose between pleading his case before an Adjustment Board or the state courts, citing for support *Alexander v. Gardner–Denver Co.,* 415 *U.S.* 36, 94 *S.Ct.* 1011, 39 *L.Ed.*2d 147 (1974), a case based on a Title VII racial-discrimination claim that did not involve the railway industry. *Amicus* urges us to adopt a standard whereby preemption is found not to be appropriate when a claim of any sort is based on a statutory right independent of rights established in the collective-bargaining agreement. We reject those related arguments because they ignore a basic precept of the law of preemption: a local statute's application is nullified to the extent that it interferes with the congressional purpose.

The Railway Labor Act was adopted to serve the interests of railroad employees by creating a statutory scheme providing for the compulsory, prompt, and final settlement of grievances before a balanced tribunal. *Union Pac. R.R. v. Price,* 360 *U.S.* 601, 614, 79 *S.Ct.* 1351, 1358, 3 *L.Ed.*2d 1460, 1468 (1959). To obtain the advantage of that procedure, railroad employees "were willing to give up their remedies outside of the [Railway Labor Act]." *Id.* at 613, 79 *S.Ct.* at 1358, 3 *L.Ed.*2d at 1467. Allowing Maher to bring his claim of handicap discrimination before the courts would interfere impermissibly with Congress's intent that the Adjustment Boards be the sole arbiter of claims related to railroad "rules and working conditions," *see Sheehan, supra,* 439 *U.S.* at 94, 99 *S.Ct.* at 402, 58 *L.Ed.*2d at 359, and of disputes over an employee's refusal to work "when confronted by a hazardous condition related to the performance of the employee's duties," see 45 *U.S.C.A.* § 441(b)(1) and (c).

Opening the courts to such claims would also compromise the congressional goal of national uniformity ensured by limiting jurisdiction over disputes arising from the application of collective-bargaining agreement provisions to a system of Adjustment Boards familiar with railroad-oriented issues. This is not a case in which "enforcement of [the LAD] and the collective-bargaining process complement rather than conflict with each other." *LePore v. National Tool & Mfg. Co.*, 115 *N.J.* 226, 228, 557 *A.*2d 1371 (citing *Thornton v. Potamkin Chevrolet*, 94 *N.J.* 1, 462 *A.*2d 133 (1983)), *cert. denied,* —— *U.S.* ——, 110 *S.Ct.* 366, 107 *L.Ed.*2d 353 (1989); *accord Alexander, supra,* 415 *U.S.* at 48–49, 94 *S.Ct.* at 1019–20, 39 *L.Ed.*2d at 158 (Congress intended that the federal courts be the final arbiter of Title VII claims; "[t]he clear inference is that Title VII was designed to supplement, rather than supplant" the arbitral process).

This Court has been vigilant in enforcing New Jersey's goal of eradicating employment discrimination against the handicapped. See, *e.g., Jansen, supra,* 110 *N.J.* 363, 541 *A.*2d 682; *Andersen v. Exxon Co.,* 89 *N.J.* 483, 446 *A.*2d 486 (1982). Moreover, we have not hesitated to find the preemption doctrine inapplicable "in the absence of an *unambiguous* congressional mandate to that effect." *Dewey, supra,* 121 *N.J.* at 69, 577 *A.*2d 1239; *accord Feldman v. Lederle Laboratories,* 125 *N.J.* 117, 137, 592 *A.*2d 1176, 1186 (1991). We would not feel constrained to reach the result we do had the collective-bargaining agreement under which Maher worked failed to provide for arbitral review of the effect of an employee's physical condition on job performance, as had been so in the matter that is the source of the passage quoted by our dissenting colleague, *post* at 490, 593 *A.*2d at 768. See *Quinn v. Southern Pacific Transportation Co.,* 76 *Or.App.* 617, 622, 711 *P.*2d 139, 144 (1985), *review denied,* 300 *Or.* 546, 715 *P.*2d 93 (1986). In that case the state statute was the sole means of protecting the employee's right to be free from unlawful handicap discrimination. *Ibid.*

That is not the situation here. Because the agreement addresses Maher's circumstances, we find the congressional intent clear. The federal interest in preserving the Railway Labor Act arbitration scheme for disputes over application of the collective-bargaining agreement is extraordinarily strong, such that any local interference is not to be tolerated.

## IV

The judgment of the Appellate Division is affirmed in part and reversed in part, and the cause remanded to the Law Division.

O'HERN, J., concurring and dissenting.

Plaintiff, Edward Maher, has made a claim under our State law, the Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -42, that his employer, New Jersey Transit Rail Operations, Inc. (NJT), discriminated against him because of his visual disability. His claim of discrimination does not involve the interpretation or application of any federal law or of any terms of the relevant collective-bargaining agreement (CBA). Nevertheless, this Court upholds the dismissal of his LAD claim on the ground that federal law preempts it. Because federal law does not preempt an LAD claim, I dissent from that portion of the Court's decision.

Arbitration is a wonderful thing when people have agreed to it. Arbitration is a terrible thing when it is forced on people who have never agreed to it. Defeated, disappointed, disenfranchised, they will harbor deep resentments toward a system of law that deprives them of the inestimable privilege of asserting State-created rights to be free from discrimination. Our Legislature has recently reinforced its intention that the LAD "be liberally construed so that all common law remedies * * * are available to persons protected by the LAD," including compensatory and punitive damages and the right to trial by

jury. *N.J.S.A.* 10:5–3 (Assembly Judiciary, Law, and Public Safety Committee Statement).

Maher never agreed to arbitrate his claims of rights under the New Jersey LAD, and his union had no power to waive those rights. The power of his union is derived from the Railway Labor Act (RLA). The purpose of the RLA is " 'to promote stability in labor-management relations in this important national industry by providing effective and efficient remedies for the resolution of railroad-employee disputes *arising out of the interpretation of collective-bargaining agreements.*' " *Quinn v. Southern Pac. Transp. Co.*, 76 *Or.App.* 617, 623, 711 *P.*2d 139, 143 (1985) (quoting *Union P.R.R. v. Sheehan*, 439 *U.S.* 89, 94, 99 *S.Ct.* 399, 402, 58 *L.Ed.*2d 354, 359 (1978)), *review denied,* 300 *Or.* 546, 715 *P.*2d 93 (1986). The RLA is not an anti-discrimination act. As noted by the United States Supreme Court, "No provision in the Act even mentions discrimination in hiring." *Colorado Anti–Discrimination Comm'n v. Continental Air Lines*, 372 *U.S.* 714, 724, 83 *S.Ct.* 1022, 1027, 10 *L.Ed.*2d 84, 91 (1963). The CBA in this case similarly does not seek by its terms to provide the handicapped employee with protection against discrimination. Thus, the employee must derive the right to be free from discrimination from another source.

That source is our State law. The New Jersey LAD has provided an independent set of protections for the handicapped that are separate and distinct from the RLA and the terms of the CBA. In the context of the Fair Labor Standards Act, the United States Supreme Court recognized that "[w]hile courts should defer to an arbitral decision where the employee's claim is based on rights arising out of the collective-bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." *Barrentine v. Arkansas–Best Freight Sys.*, 450 *U.S.* 728, 737, 101 *S.Ct.* 1437, 1443, 67 *L.Ed.*2d 641, 651 (1981).

Here, the employee's claim arises out of a State statute, not the CBA.

It is important to remember that there are three parties to an employment agreement—the employer, the employee, and the public. There is a public interest in New Jersey that our employees be free from age discrimination, and that simply cannot be contracted away by a union. In *Thornton v. Potamkin Chevrolet,* 94 *N.J.* 1, 462 *A.*2d 133 (1983), we held that even when an employee submits a grievance to arbitration, the employee agrees to arbitrate *only* his or her contractual rights under a CBA. In an LAD proceeding an employee asserts statutory rights guaranteed to him or her by the State of New Jersey: " '[T]he relationship between the forums [arbitral and administrative] is complementary since consideration of the claim by both forums may promote the policies underlying each.' " *Id.* at 7, 462 *A.*2d 133 (quoting *Alexander v. Gardner–Denver Co.,* 415 *U.S.* 36, 50–51, 94 *S.Ct.* 1011, 1020–21, 39 *L.Ed.*2d 147, 159 (1974)).

In *Thornton* we adopted the policy of *Alexander v. Gardner–Denver Co.* with respect to enforcement of New Jersey's LAD. We said that the unique role of our LAD constitutes a " 'statutorily created exception' " and modifies policies set forth in employment laws. *Ibid.* (quoting *Terry v. Mercer Cty. Freeholder Bd.,* 86 *N.J.* 141, 151, 430 *A.*2d 194 (1981)).

We also noted that complementary jurisdiction does not mark the " 'death knell' " for grievance of discrimination claims. *Id.,* at 8, 462 *A.*2d 133 (quoting *Alexander, supra,* 415 *U.S.* at 54, 94 *S.Ct.* at 1022, 39 *L.Ed.*2d at 162). In the vast majority of cases, grievance proceedings may resolve misunderstandings and will often resolve the dispute in swifter, simpler, and less costly proceedings. We also noted that although not binding on the State agency (or, as here, the State court), the arbitrator's decision should be received into evidence and accorded such weight as is appropriate.

The majority's disposition conflicts with the principles and policies expressed in the recent Supreme Court decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 *U.S.* ——, 111 *S.Ct.* 1647, 114 *L.Ed.*2d 26 (1991). In that case the Court held that when an employee had *individually agreed* to arbitrate all disputes arising out of his contract of employment, that agreement could be held to embrace age discrimination in employment.

The Court was careful to distinguish *Alexander, supra,* 415 *U.S.* 36, 94 *S.Ct.* at 1014, 39 *L.Ed.*2d 147, noting that the issue there was "whether a discharged employee whose grievance had been arbitrated pursuant to an arbitration clause in a collective-bargaining agreement was precluded from subsequently bringing a Title VII action based upon the conduct that was the subject of the grievance." 500 *U.S.* at ——, 111 *S.Ct.* at 1656, 114 *L.Ed.*2d at 42. Citing *Barrentine, supra,* 450 *U.S.* 728, 101 *S.Ct.* 1437, 67 *L.Ed.*2d 641, the Court recognized that "[i]n holding that the statutory claims there were not precluded, we noted * * * the difference between contractual rights under a collective-bargaining agreement and individual statutory rights, the potential disparity in interests between a union and an employee, and the limited authority and power of labor arbitrators." 500 *U.S.* at ——, 111 *S.Ct.* at 1657, 114 *L.Ed.*2d at 43.

So too here. This CBA created only contractual rights and not statutory rights.[1] It had nothing to do with plaintiff's statutory rights. To label these claims a "minor dispute" and to hold that they cannot be asserted in a State forum is demeaning to a handicapped person. No principle of federal

---

[1]Even in *Gilmer,* Justice Stevens, joined by Justice Marshall, noted in dissent how hollow is the suggestion that employees have voluntarily agreed to arbitrate such claims. " 'The trouble about the matter is that a great many of these contracts that are entered into are really not [voluntary] things at all.' " 500 *U.S.* at ——, 111 *S.Ct.* at 1659, 114 *L.Ed.*2d at 46 (quoting Hearing on S. 4213 and S. 4214 before a Subcomm. of the Senate Comm. on the Judiciary, 67th Cong., 4th Sess. 9 (1923) (statement of Senator Walsh)).

preemption law requires that result. The Supreme Court developed the "minor dispute" doctrine in railway-labor cases as a way of dividing, within the federal framework of railway labor relations, "the jurisdiction and functions of the Adjustment Board from those of the Mediation Board, giving them their distinct characters." *Elgin, J. & E. Ry. v. Burley,* 325 *U.S.* 711, 722, 65 *S.Ct.* 1282, 1289, 89 *L.Ed.* 1886, 1894 (1945). That purpose continues today. *See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 *U.S.* 299, 109 *S.Ct.* 2477, 105 *L.Ed.*2d 250 (1989) (validity of including testing for drugs within ambit of previously negotiated health testing procedures can be resolved by Adjustment Board rather than through further negotiation and mediation). Not every dispute arising in the course of employment between employers and employees who are covered by the RLA falls within the major/minor dispute framework. *See Atchison, T. & S. Fe Ry. v. Buell,* 480 *U.S.* 557, 563–64, 107 *S.Ct.* 1410, 1414, 94 *L.Ed.*2d 563, 572 (1987) (In FELA case, Court rejects railroad's argument that RLA is "the exclusive forum for any dispute arising out of workplace conditions"). For example, race discrimination falls outside of that framework. *See Colorado Anti–Discrimination Comm'n, supra,* 372 *U.S.* 714, 83 *S.Ct.* 1022, 10 *L.Ed.*2d 84. The majority now applies the minor-dispute doctrine in a way that embraces, and hence extinguishes, plaintiff's State-statutory claim of handicap discrimination. The majority apparently views the race-discrimination claim in *Colorado Anti–Discrimination Commission* as distinguishable from plaintiff's handicap-discrimination claim here because plaintiff's claim involves railroad rules concerning " 'working conditions.' " *Ante* at 484, 593 *A.*2d at 765 (quoting *Union P.R.R. v. Sheehan, supra,* 439 *U.S.* at 94, 99 *S.Ct.* 399, 402, 58 *L.Ed.*2d at 359. But since when has handicap discrimination been a "working condition"? Of course, employers can maintain and establish "bona fide occupational qualifications." *N.J.S.A.* 10:5–2.1. However, in applying those qualifications to individual employees, the employer cannot use those qualifications as a "pretext

for discrimination." *Andersen v. Exxon Co.*, 89 *N.J.* 483, 493, 446 *A.*2d 486 (1982). Plaintiff may not have the best of cases, but that should not occasion us to impair the statutory rights of other employees against whom more virulent discrimination might be practiced.

Whether NJT acted in accordance with the provisions of the CBA is simply irrelevant to the LAD inquiry. Because the source of the legal and factual underpinnings of Maher's handicap-discrimination claims are in the LAD, those claims are not preempted by the RLA.

As noted by the majority, preemption is "a question of congressional intent." *Ante* at 464, 593 *A.*2d at 755. It is inconceivable to me that by enacting the RLA, Congress intended to immunize railroads from state anti-discrimination laws. *See Colorado Anti–Discrimination Comm'n, supra,* 372 *U.S.* at 724, 83 *S.Ct.* at 1027, 10 *L.Ed.*2d at 91 ("There is even less reason to say that Congress, in passing the Railway Labor Act * * *, intended to bar States from protecting employees against racial discrimination.") (footnote omitted). Yet, given its holding, that is apparently just what the Court believes. I agree with the court in *Quinn:*

> [T]he [United States Supreme] Court specifically has held that the [RLA] does not bar states from enacting legislation to protect employees against racial discrimination in hiring and has noted that it does not even mention discrimination in hiring. By analogy, a state is not preempted from legislatively extending protection in the field of discrimination in employment of handicapped workers to include railroad employees. It follows that, where a personal judicial remedy created by valid state legislation exists, a claim of right derived from that legislation is within the jurisdiction of the appropriate state court. [76 *Or.App.* at 624, 711 *P.*2d at 144 (citations omitted).]

I would restore plaintiff's LAD claim.

*For affirmance in part, reversal in part*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*For reversal*—Justice O'HERN—1.